The STATE OF NEW YORK, the City of New York, the New York City Health & Hospitals Corp., Dr. Irving Rust, on behalf of himself, his patients and all others similarly situated, Dr. Melvin Padawer, on behalf of himself, his patients, and all others similarly situated, Medical and Health Research Association of New York City, Inc., Planned Parenthood of New York City, Inc., Planned Parenthood of Westchester/Rockland, and Health Services of Hudson County, New Jersey, Plaintiffs–Appellants,

v.

Dr. Louis SULLIVAN, or his successor, Secretary of the United States Department of Health and Human Services, Defendant–Appellee.

Nos. 575, 633, Dockets.
88–6204, 88–6206.

United States Court of Appeals,
Second Circuit.

Argued Jan. 4, 1989.

Decided Nov. 1, 1989.

Suzanne Lynn, Asst. Atty. Gen., Chief, Civ. Rights Bureau, New York State Dept. of Law, New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Marla Tepper, Asst. Atty. Gen., New York City, of counsel), for plaintiff-appellant, The State of N.Y.

Rachel N. Pine, New York City (Janet Benshoof, Lynn Paltrow, Catherine Weiss, American Civ. Liberties Union, New York City, Norman Siegel, Art Eisenberg, New York Civ. Liberties Union, New York City, Laurie R. Rockett, Hollyer, Jones, Brady, Smith Troxwell, Barrett & Chira, New York City, of counsel), for plaintiffs-appellants Dr. Irving Rust, Dr. Melvin Padawer, Medical and Health Research Ass'n of New York City, Inc., Planned Parenthood of New York City, Inc., Planned Parenthood of Westchester/Rockland, and Health Services of Hudson County, New Jersey.

Peter Zimroth, Corp. Counsel, City of New York, New York City (Lorna Bade Goodman, Asst. Corp. Counsel, Chief, Affirmative Litigation Div., Hillary Weisman, Asst. Corp. Counsel, City of New York, New York City, of counsel), for plaintiffs-appellants City of New York and City of New York Health and Hospitals, Corp.

Alfred Mollin, Atty., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C. (John R. Bolton, Asst. Atty. Gen., John F. Cordes, Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., New York City, Joel Mangel, Deputy Chief Counsel, Public Health Service, Carol Conrad, Office of the Gen. Counsel, Dept. of Health and Human Services, Washington, D.C., of counsel), for defendant-appellee.

Kent Masterson Brown, Lexington, Ky., Michael Vaccari, New York City, and Clarke D. Forsythe, Americans United for Life Legal Defense Fund, Chicago, Ill., of counsel, submitted a brief in support of appellee for amici curiae American Academy of Medical Ethics, Ass'n of American Physicians & Surgeons, American Ass'n of Pro Life Obstetricians and Gynecologists, American Ass'n of Pro-life Pediatricians, Nat. Doctors for Life, Christian Medical Soc., Christian Medical Foundation, Alabama Physicians for Life, Physicians for Moral Responsibility, Nat. Ass'n of Pro-life Nurses, California Pro-life Nurses Ass'n, Georgia Nurses for Life, Indiana Nurses Concerned for Life, Missouri Nurses for Life, New York State Nurses for Life, Inc., Pennsylvania Nurses for Life, Rhode Island Nurses for Life, Washington Pro-life Nurses Ass'n, Southern Center for Law and Ethics, and Certain Fellows and Members of the American College of Obstetricians and Gynecologists and of the American Medical Ass'n.

Kirk B. Johnson, Edward B. Hirshfeld, American Medical Ass'n, Chicago, Ill., Ann E. Allen, American College of Obstetricians and Gynecologists, Washington, D.C., Jack R. Bierig, David F. Graham, Lynn D. Fleisher, and Richard D. Raskin, Sidley & Austin, Chicago, Ill., of counsel, submitted a brief in support of appellants for amici curiae the American Medical Ass'n, American College of Obstetricians and Gynecologists, and American Soc. of Human Genetics.

Bruce S. Wolff, Charles S. Sims, Suzette Brooks and William S. Koenig, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel, submitted a brief in support of appellants for amici curiae the American Public Health Ass'n, the Ass'n of State and Territorial Health Officers, the Ass'n of Schools for Public Health, the American

College of Physicians, the American Medical Student Ass'n, the Ass'n of Reproductive Health Professionals, the California Coalition of Nurse Practitioners, the Maryland Dept. of Health and Mental Hygiene, the Nat. Ass'n of Nurse Practitioners in Family Planning, the Nat. Urban League, the Nurses Ass'n of the American College of Obstetricians and Gynecologists, the Ohio Dept. of Health, the Wisconsin Nurse Practitioners in Reproductive Health, and Dr. Allan Rosenfield, Dean of the Columbia University School of Public Health.

Jonathan Lang, Ann Barcher, Barry Ensminger, Janice Goodman, Mary Sue Henifin, Kent Hirozawa, Susan Waltman and Sheldon Oliensis, President, the Ass'n of the Bar of the City of New York, New York City, of counsel, submitted a brief in support of appellants for amicus curiae the Committees on Civ. Rights, Medicine and Law, and Sex and Law of the Ass'n of the Bar of the City of New York.

Julius L. Chambers, Charles S. Ralston, John C. Dubin, Sherrilyn A. Ifill and Charlotte B. Rutherford, NAACP Legal Defense and Educational Fund, Inc., New York City of counsel, submitted a brief in support of appellants for amicus curiae NAACP Legal Defense and Educational Fund, Inc.).

Nadine Taub, Rutgers University School of Law, Newark, N.J., Sarah E. Burns, Legal Director, NOW Legal Defense and Educ. Fund, New York City, John H. Hall, Walter J. Walsh and Joel Kosman, Debevoise & Plimpton, New York City of counsel, submitted a brief in support of appellants for amici curiae NOW Legal Defense and Educ. Fund, Nat. Abortion Rights Action League, American Ass'n of University Women, American Humanist Ass'n, American Jewish Congress, Americans for Religious Liberty, Catholics for a Free Choice, Center for Population Options, Committee to Defend Reproductive Rights, Episcopal Women's Caucus, Equal Rights Advocates, Inc., Nat. Abortion Federation, Nat. Council of Jewish Women, Nat. Emergency Civ. Liberties Committee, Nat. Organization for Women, Nat. Women's Health Network, Nat. Women's Political Caucus, Organization of Pan–Asian American Women, Public Citizen Health Research Group, United Church of Christ, Women's Equity Action League, Women's Law Project; Women's Legal Defense Fund, Young Women's Christian Ass'n of U.S.A.).

David M. Becker and Virginia A.S. Kling, Wilmer, Cutler & Pickering, Washington, D.C., of counsel, submitted a brief in support of appellants for amici curiae Representative Bill Green, Senators Barbara A. Mikulski, Lowell P. Weicker, Jr., Brock Adams, John H. Chafee, Alan Cranston, Howard M. Metzenbaum, Paul Simon, Robert T. Stafford, William S. Cohen, Daniel J. Evans, Bob Packwood, and Timothy E. Wirth, and Representatives Daniel K. Akaka, Les AuCoin, Julian C. Dixon, Vic Fazio, William H. Gray III, Steny H. Hoyer, William Lehman, Robert J. Mrazek, John Edward Porter, Martin Olav Sabo, Henry A. Waxman, Jim Bates, Rick Boucher, Cardiss Collins, Mickey Leland, James H. Scheuer, Ron Wyden, Gary L. Ackerman, Chester G. Atkins, Anthony C. Beilenson, Howard L. Berman, Sherwood L. Boehlert, Don Bonker, Barbara Boxer, George E. Brown, Jr., Albert G. Bustamante, Benjamin L. Cardin, Thomas R. Carper, George W. Crockett, Jr., Peter A. DeFazio, Ronald V. Dellums, Mervyn M. Dymally, Don Edwards, Lane Evans, Dante B. Fascell, Walter E. Fauntroy, Barney Frank, Bill Frenzel, Robert Garcia, Sam Gejdenson, Benjamin A. Gilman, Charles A. Hayes, James M. Jeffords, Nancy L. Johnson, Robert W. Kastenmeier, Joseph P. Kennedy II, Peter H. Kostmayer, Richard H. Lehman, Sander M. Levin, Mel Levine, John Lewis, Mike Lowry, Matthew G. Martinez, Robert T. Matsui, George Miller, John R. Miller, Jim Moody, Constance A. Morella, Bruce A. Morrison, Stephen L. Neal, Nancy Pelosi, Claude Pepper, Charles B. Rangel, Marge Roukema, Claudine Schneider, Patricia Schroeder, Christopher Shays, David E. Skaggs, Louise M. Slaughter, Lawrence J. Smith, Olympia J. Snowe, Stephen J. Solarz, Pete Stark, Gerry E. Studds, Edlophus Towns, Morris K. Udall, Ted Weiss, Alan Wheat, and Howard Wolpe.

Mark E. Chopko, Gen. Counsel and Helen M. Alvare, U.S. Catholic Conference, Wash-

ington, D.C., of counsel, submitted a brief in support of appellee for amicus curiae the U.S. Catholic Conference).

James Bopp, Jr., and Richard E. Coleson, Brames, McCormick, Bopp & Abel, Terre Haute, Ind., of counsel, submitted a brief in support of appellee for amici curiae U.S. Senator Gordon J. Humphrey and U.S. Congressmen Thomas J. Tauke, Thomas A. Luken, Thomas J. Bliley, Dan Coats, Christopher H. Smith, Henry J. Hyde, Alan B. Mollohan, and Vin Weber.

Before KEARSE, CARDAMONE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This appeal involves the validity of regulations promulgated by the Secretary of Health and Human Services (the "Secretary"). The statutory authority for these regulations is Section 1008, 42 U.S.C. § 300a–6, of Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–41 (1982 & Supp. V 1987) ("Title X"). Section 1008 states: "None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a–6. The regulations in question were promulgated in early 1988 and constitute a divergence from past agency policy. The new regulations limit the activities of Title X grantee projects with regard to counseling and referral for abortion, require physical and financial separation of Title X projects from prohibited activities, and restrict advocacy concerning abortions by Title X projects.

In challenging the new regulations, plaintiffs raise three principal issues: (i) whether the regulations are consistent with Section 1008; (ii) whether the prohibition on counseling concerning abortion within Title X projects violates the First and Fifth Amendment rights of pregnant women; and (iii) whether the regulations on counseling and advocacy infringe the First Amendment rights of health care providers. We hold that the regulations in question are a permissible construction of the statute and do not violate the constitutional rights of women or Title X grantees.

## BACKGROUND

The facts are not in dispute and are amply described in the district court opinion, *State of New York v. Bowen*, 690 F.Supp. 1261 (S.D.N.Y.1988), familiarity with which is assumed. A brief recounting will therefore suffice for purposes of this opinion. Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–41 authorizes the Secretary to make grants to public and private nonprofit entities to establish and operate family planning projects. It is the single largest source of federal funding of family planning services. Appellants include a number of Title X grantees—the State of New York, which receives Title X funds through the New York State Department of Health; the City of New York; the New York City Health and Hospitals Corporation; Planned Parenthood of New York City, Inc.; Planned Parenthood of Westchester/Rockland; Medical and Health Research Association of New York City, Inc.; Health Services of Hudson County, New Jersey; and Dr. Irving Rust and Dr. Melvin Padawer, doctors who supervise Title X-funded programs, who are suing on behalf of themselves and their patients. The defendant is the Secretary of the Department of Health and Human Services.

The Secretary has the power to make Title X grants "in accordance with such regulations as [he] may promulgate." 42 U.S.C. § 300a–4(a). On February 2, 1988, the Secretary promulgated the regulations in question pursuant to Section 1008. The new regulations impact on counseling concerning abortion, geographic and administrative relationships between Title X grantees and those engaging in activities concerning abortion, and advocacy concerning abortion. There is little doubt that the new regulations were intended as a departure from prior administrative practice. While Title X funds were never permitted in the past to be used either to perform or to subsidize actual abortions, *see* 36 Fed.Reg. 18,465, 18,466 (1971) (codified at 42 C.F.R. § 59.5(a)(9) ("The project will not provide abortion as a method of family planning.");

see also 42 C.F.R. § 59.5(a)(5) (1986), administrative interpretations at first permitted, and later required, Title X projects to provide information about, and referral for, abortions, including names and addresses of abortion clinics. See U.S. Dep't of Health, Educ. & Welfare, *Program Incentives for Project Grants for Family Planning Services* (Jan.1976); U.S. Dep't of Health and Human Services, *Program Guidelines for Project Grants for Family Planning Services* § 8.6 (1981). Title X programs thus included "non-directive" counseling about abortion as a method of family planning. Abortion-related activities permissible under the earlier practice have been summarized as follows:

> [T]he provision of information concerning abortion services, mere referral of an individual to another provider of services for an abortion, and the collection of statistical data and information regarding abortion are not considered to be proscribed by § 1008. The provision of "pregnancy counseling" in the sense of encouraging persons to obtain abortions and the provision of transportation to persons to enable them to obtain abortions, on the other hand, are considered to be proscribed by § 1008. The test to be applied, then, appears to be whether the immediate effect of the activity in question is to encourage or promote the use of abortion as a method of family planning. If the immediate effect of the activity is essentially neutral as in the cases of mere referral or collection of statistical data, then the activity does not fall afoul of § 1008.

Memorandum from C. Conrad, Office of the General Counsel, Department of Health, Education and Welfare, to E. Sullivan (Apr. 14, 1978) (footnotes omitted) (reproduced in Brief of the Secretary of Health and Human Services as Amicus Curiae at Attachment B, *Valley Family Planning v. North Dakota*, 661 F.2d 99 (8th Cir.1981) [hereinafter Memorandum of Apr. 14, 1978].

The new regulations expressly prohibit those activities that "assist" a woman to obtain an abortion, while not interfering with the right to receive information about abortion from sources other than Title X projects. See 42 C.F.R. § 59.10 (1988); see also 53 Fed.Reg. 2941–42 (1988). The regulations thus curtail counseling, nondirective or not, by Title X projects concerning abortion. In attempting to "set specific standards for compliance with the statutory requirement that none of the funds appropriated under Title X may be used in programs where abortion is a method of family planning," 53 Fed.Reg. 2922 (1988), Section 59.8(a)(1) of the regulations states that "[a] Title X project may not provide counseling concerning the use of abortion as a method of family planning." 42 C.F.R. § 59.8(a)(1) (1988). Section 59.-8(a)(3) goes on to explain:

> (3) A Title X project may not use prenatal, social service or emergency medical or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning, such as by weighing the list of referrals in favor of health care providers which perform abortions, by including on the list of referral providers health care providers whose principal business is the provision of abortions, by excluding available providers who do not provide abortions, or by "steering" clients to providers who offer abortion as a method of family planning.

42 C.F.R. § 59.8(a)(3) (1988). The regulations thus allow a service provider to respond to a client's inquiry for information about abortion by furnishing the name of abortion providers, but only in a prescribed fashion. After a client is diagnosed as pregnant, "the project refers the woman for prenatal pregnancy care rather than providing 'options counseling,' which could violate section 1008 by influencing her choice toward abortion." 53 Fed.Reg. 2932 (1988). The discussion accompanying the new regulations explains that the limitations on "conscious weighting" of the referral lists does not prohibit the "inclusion of facilities, such as hospitals, in which abortions are performed if they are also major providers of prenatal care and other services and the referral is specifically made to the providers of prenatal care ser-

vices." 53 Fed.Reg. 2938 (1988). The provision does, as noted, ban inclusion of providers whose "main function" is to provide abortions. *Id.*

Subsection (4) states that the regulations do not prohibit provision of information "medically necessary to assess the risks and benefits of different methods of contraception," provided no counseling with respect to abortion is furnished. 42 C.F.R. § 59.8(a)(4) (1988). Specifically, keeping on hand copies of the yellow pages that contain advertisements for and information on where to obtain an abortion, to be given to a client who asks for them, is permitted: "[K]eeping the yellow pages in the project office and provision of medical records to another medical provider would not be proscribed, as they are not actions that directly 'assist' a woman to obtain an abortion." 53 Fed.Reg. 2942 (1988).[1]

The second area of change under the new regulations concerns "program integrity." Section 59.9 provides that "[a] Title X project must be organized so that it is physically and financially separate" and "must have an objective integrity and independence from prohibited activities." 42 C.F.R. § 59.9 (1988). The integrity and independence of Title X projects are to be evaluated on a case-by-case basis. That evaluation will take into account, *inter alia*, whether separate accounting records are maintained, whether facilities in which prohibited activities occur are physically separate from Title X facilities, and whether the personnel in the Title X project also serve in projects in which prohibited activities occur. 42 C.F.R. § 59.9(a)–(d) (1988).

The third area relates to advocacy concerning abortion. Section 59.10 prohibits the use of Title X funds for activities that "encourage, promote or advocate abortion," and sets forth the following guidelines, illustrated with examples:

(a) A Title X project may not encourage, promote or advocate abortion as a method of family planning. This requirement prohibits actions to assist women to obtain abortions or increase the availability or accessibility of abortion for family planning purposes. Prohibited actions include the use of Title X project funds for the following:

(1) Lobbying for the passage of legislation to increase in any way the availability of abortion as a method of family planning;

(2) Providing speakers to promote the use of abortion as a method of family planning;

(3) Paying dues to any group that as a significant part of its activities advocates abortion as a method of family planning;

(4) Using legal action to make abortion available in any way as a method of family planning; and

(5) Developing or disseminating in any way materials (including printed matter and audiovisual materials) advocating abortion as a method of family planning.

42 C.F.R. § 59.10(a) (1988).

Appellants filed two separate actions, *New York v. Bowen*, No. 88–0701, and *Rust v. Bowen*, No. 88–0702, later consolidated, seeking declaratory and injunctive relief to prevent implementation of the new regulations. Appellants argued that the new regulations violated the letter and intent of Title X and worked a deprivation of First and Fifth Amendment rights. In a thorough opinion, the district court rejected appellants' contentions and upheld the regulations. Despite the Secretary's departure from past interpretations, the district court found the new regulations to be supported by "sufficiently reasonable grounds that they should not be set aside as arbitrary or capricious." *State of New York v.*

---

1. I do not agree with my colleagues that the regulations at issue permit the "keeping," but not the "providing," of the yellow pages to a client who asks for them. The sentence they refer to is contained in the discussion accompanying the new regulations and uses the word "keeping," not as a limiting concept, but as a response to a criticism that the regulations would prohibit "even keeping copies of the telephone yellow pages which contain advertisements by abortion clinics." 53 Fed.Reg. 2922, 2941 (1988). I believe it fairly self-evident that this response makes no sense if the yellow pages may not be provided when requested, particularly since neither the regulations nor the discussion explicitly prohibits their provision upon request.

*Bowen,* 690 F.Supp. at 1272. Similarly, the district court found appellants' constitutional claims to lack merit, holding that the regulations did not impermissibly interfere with either patients' First and Fifth Amendment rights to receive information about abortion services, *id.* at 1272–74, or Title X grantees' First Amendment rights to engage in speech concerning abortion.

## DISCUSSION

### 1. *Statutory Issues*

■ We first examine whether the regulations in question embody a construction of the statute that legitimately effectuates Congressional intent. *See Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Under Title X, the Secretary is empowered to make grants and enter into contracts "to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). His discretion, however, is subject to the restriction of Section 1008 that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a–6. We believe that Section 1008 authorizes the regulations in question.

Appellants contend that the statute proscribes only the providing for, or the funding of, the performance of abortions and that the Secretary may not prohibit abortion counseling. This is a highly strained construction of Section 1008. A principal function of grantees under Title X is to provide information or "counseling" as to a range of methods of family planning. A program that counsels use of a particular contraceptive device plainly treats that device as a "method of family planning." In this context, it would be wholly anomalous to read Section 1008 to mean that a program that merely counsels but does not perform abortions does not include abortion as a "method of family planning." Moreover, when Congress has sought to prohibit the use of federal funds to perform actual abortions, it has used language specifically tailored to that end. *See, e.g.,* Pub.L. No. 100–202, 101 Stat. 1329–99 (1987) ("Hyde Amendment" to appropriations act stating: "None of the Federal funds provided in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term...."). In the present context, the natural construction of Section 1008 is that the term "method of family planning" includes counseling concerning abortion.

Nothing in the legislative history of Title X detracts from that conclusion. The Conference Report thus stated that "[i]t is, and has been, the intent of both Houses that the funds authorized under [Section 1008] be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities. The conferees have adopted the language contained in section 1008, which prohibits the use of such funds for abortion, in order to make clear this intent." Conf.Rep. No. 91–1667, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 5068, 5080, 5081–82. The comments of a number of legislators similarly support the Secretary's position. *See, e.g.,* 116 Cong.Rec. 37,375 (1970) (remarks of Rep. Dingell) ("During the course of House hearings ... there was some confusion regarding the nature of the family planning programs envisioned, whether or not they extended to include abortion as a method of family planning. With the 'prohibition of abortion' amendment—title X, section 1008— the committee members clearly intend that abortion is not to be encouraged or promoted in any way through this legislation."); 116 Cong.Rec. 37,371 (1970) (statement of Rep. Pickle) ("I strongly support ... the provision in the House version of this legislation that prevents this bill from being construed as support for abortion.").

Appellants' contrary view of the legislative history is based entirely on highly generalized statements about the expansive scope of the family planning services intended to be provided by Title X grantees.

*See, e.g.,* S.Rep. No. 1004, 91st Cong., 2d Sess. 3, *excerpted in* 116 Cong.Rec. 24,094 (1970) ("This legislation is designed to make comprehensive, voluntary family planning services, and information relating thereto, readily available to all persons in the United States desiring such services; to provide greatly increased support for biomedical, behavioral, and operational research relevant to family planning and population; to develop and disseminate information on population growth; and to coordinate and centralize the administration of family planning and population research programs conducted by the Department of Health, Education and Welfare."); *id.* at 10, 116 Cong. Rec. at 24,095–96 ("The committee does not view family planning as merely a euphemism for birth control. It is properly a part of comprehensive health care and should consist of much more than the dispensation of contraceptive devices."); 116 Cong.Rec. 37,370 (1970) (statement of Rep. Bush) ("Most important is that this legislation be recognized as ... a health-care service mechanism and not a population control mechanism."); 116 Cong.Rec. 37,380 (statement of Rep. Kyros) ("[This legislation] will make an important contribution to the health of American mothers and children. This bill will make family planning services available to low-income women who presently want and need but cannot afford them and will increase the federal role in population research."); 116 Cong.Rec. 24,093 (statement of Sen. Hart) (legislation "moves toward providing much needed medical family planning services to millions of women who cannot afford them, and it provides for the research that will help us better to understand the phenomena of population growth and enable all couples to regulate fertility according to their individual consciences"). Whatever force such generalized statements might have in the absence of Section 1008, however, they do not specifically mention counseling concerning abortion as an intended service of Title X projects, and they surely cannot be read to trump a section of the statute that specifically excludes it. *See Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of America,* 325 U.S. 161, 168–69, 65 S.Ct. 1063, 1067–68, 89 L.Ed. 1534 (1945) (general remarks not probative of Congressional intent on narrow issue).

Similarly, we are unpersuaded that subsequent refunding of Title X by later Congresses is significant in the instant case. *Cf. Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 190–93, 98 S.Ct. 2279, 2299–2301, 57 L.Ed.2d 117 (1978) (subsequent appropriation irrelevant to previously enacted substantive law). Congress has not reenacted Title X, and the reauthorization of funding [2] does not imply that Congress was aware of, much less endorsed, every expenditure of funds by the agency. Reauthorization, for example, may simply imply acquiescence in the exercise of discretion by the agency. General statements by members of Congress at the time of refunding, *see, e.g.,* 119 Cong.Rec. 9593 (1973) (statement of Sen. Pell) (urging extension of funding and noting that "these programs seem to be working well"); 124 Cong.Rec. 31,252 (1978) (statement of Rep. Rogers), are similarly unenlightening. Moreover, " 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' " *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960)). "[E]ven when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." *Consumer Prod. Safety Comm'n v. GTE Sylvania,* 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13.

---

**2.** Title X was extended through fiscal year 1974 by Pub.L. No. 93–45, 87 Stat. 91 (1973). It was reauthorized in 1975, Pub.L. No. 94–63, 89 Stat. 304 (1975); again in 1977, Pub.L. No. 95–83, 91 Stat. 383 (1977); again in 1978, Pub.L. No. 95–613, 92 Stat. 3093 (1978); again in 1981, Pub.L. No. 97–35, 95 Stat. 358 (1981); and again in 1984, Pub.L. No. 98–512, 98 Stat. 2409 (1984). *See* H.R.Rep. No. 159, 99th Cong., 1st Sess. 2 (1985) (summarizing history). Since 1985 the Title X program has been funded through a series of continuing resolutions.

In addition, the rejection by Congress of proposed amendments to Title X specifically prohibiting funds for counseling and referral for abortion, *see* H.R.Rep. No. 159, 99th Cong., 1st Sess. 6–7 (1985); 124 Cong. Rec. 37,045–46 (1978), is not helpful to interpretation because Congress may have believed that the statute already provided for such a result. *See* 124 Cong.Rec. 37,-046 (1978) (statement of Rep. Rogers) ("[T]he point of what we are doing in title X ... is to let people know how to avoid pregnancy. We cannot use any funds for abortion. The amendment is not needed."); *see also* 120 Cong.Rec. 21,688 (1974) (remarks of Rep. Roncallo); 124 Cong.Rec. 31,238 (1978) (statement of Rep. Rogers) ("simple extension" of Title X is not a "pro-abortion vote"). Finally, the existence of a lengthy political debate in Congress over the last several years on the general subject of funding for counseling and referral for abortion, *see* Appellants' Br. at 35–36, is not a reason for courts to alter their interpretation of Title X as enacted.

Appellants next argue that the Secretary is bound by prior administrative constructions of the statute and may not, therefore, promulgate regulations diverging significantly from past practice, even if the Secretary determines that practice was at odds with Congressional intent. The fact that an agency is departing from a long-held prior interpretation is of course an item to be taken into account by a court reviewing agency actions. Such a departure does not of course entitle a court to eschew all deference to the agency's judgment. Indeed, the Supreme Court has directly held that courts must show some deference to a rescission or modification of regulations as well as to an agency's initial interpretation. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41, 103 S.Ct. 2856, 2865, 77 L.Ed.2d 443 (1983). In *American Trucking Ass'n v. Atchison, Topeka & S.F. Ry. Co.*, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), for example, the Supreme Court upheld the authority of the Interstate Commerce Commission to alter an interpretation of a statute that it had followed for some twenty-five years on the ground that it had decided that interpretation was incorrect. The Court remarked that an agency "faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice." 387 U.S. at 416, 87 S.Ct. at 1618. Similarly, in *Chevron*, the Supreme Court rejected the argument that an agency's interpretation "is not entitled to deference because it represents a sharp break with prior interpretations of the [statute in question]." *Chevron*, 467 U.S. at 862, 104 S.Ct. at 2791. Such revised interpretation deserves deference because "[a]n initial agency interpretation is not instantly carved in stone" and "the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Id.* at 863–64, 104 S.Ct. at 2791–92.

We recently applied these principles in *Securities Indus. Ass'n v. Board of Governors of the Federal Reserve System*, 839 F.2d 47 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2830, 100 L.Ed.2d 931 (1988), in which we upheld an outright reversal of regulatory policy based on the Federal Reserve Board's reevaluation of the Congressional scheme embodied in the Glass–Steagall Act, 12 U.S.C. §§ 24 (Seventh), 78, 377–78 (1982 and Supp. V 1987). We held that that Act provided the Federal Reserve Board with adequate authority to allow bank holding-company subsidiaries to deal in certain securities notwithstanding a long-existing, previously unchallenged regulatory prohibition on such dealing. In the instant case, the Secretary has concluded that prior policy failed to implement the statute. *See* 53 Fed.Reg. 2923 ("Upon review of the guidelines, however, the Department for several reasons no longer believes that these [past] approaches were correct."). As noted above, we believe that the language and history of Title X are fully consistent with the regulations challenged in the instant case. Even if less than the customary deference is accorded the Secretary in light of prior administrative construction, the regulations before us must be upheld.

■ Turning to the program integrity regulations, appellants contend that the separation requirements of Section 59.9 of the regulations, mandating separate facilities, personnel and records, frustrate the intent of Congress that Title X programs be an integral part of a broader health care system. They argue that such integration is impermissibly burdened because the efficient use of non-Title X funds by Title X grantees will be adversely affected by the regulations. For support, they rely principally on the generalized language in the House Conference Report that "[t]he legislation does not and is not intended to interfere with or limit programs conducted in accordance with State or local laws and regulations which are supported by funds other than those authorized under this legislation." Conf.Rep. No. 1667, 91st Cong., 2d Sess. 6, *reprinted in* 1970 U.S.Code Cong. & Admin.News 5080, 5082. The argument proves too much, however, because it contemplates that non-federal grantors can override specific restrictions embodied in federal legislation.

Moreover, the Secretary could reasonably conclude that a degree of separation beyond arbitrary bookkeeping entries between Title X projects and projects counseling or performing abortions is necessary if Section 1008's restriction is to be given any meaning in practice. Indeed, the new separation requirements are hardly a major departure from past administrative construction. For example, in 1978, the Department of Health and Human Services' predecessor agency acknowledged that "the grantee must insure that [a] Title X-supported program is separate and distinguishable from those other [abortion-related] activities. Separate bookkeeping entries are not enough." Memorandum of Apr. 14, 1978, *supra,* at 5. We believe the new regulations fit comfortably within that policy. Finally, the new regulations, as described earlier, provide flexibility in requiring a case-by-case evaluation of compliance by Title X projects. 53 Fed.Reg. 2940. We thus conclude that the separation requirements are within the Secretary's authority based on a valid construction of the statute. *See State of New York v. Bowen,* 690 F.Supp. at 1267, 1271–72.

We need say little to dispose of appellants' contention that the regulations are arbitrary and capricious, as that test is functionally equivalent to the reasonableness test of *Chevron,* 467 U.S. at 843–45, 104 S.Ct. 2781–83.

### 2. *Constitutional Issues*

Appellants also argue that the counseling and advocacy regulations are unconstitutional on several grounds. First, they assert that the regulations impermissibly burden a woman's privacy right to an abortion. Second, they contend that the regulations violate the First Amendment. On both points, however, Supreme Court precedent is to the contrary.

■ With regard to the right of privacy, the Supreme Court has held that government has no constitutional obligation to subsidize an activity merely because the activity is constitutionally protected. *See, e.g., Cammarano v. United States,* 358 U.S. 498, 515, 79 S.Ct. 524, 534, 3 L.Ed.2d 462 (1959) (Douglas, J., concurring). The Court has specifically held, moreover, that government may validly choose to favor childbirth over abortion and to implement that choice by funding medical services relating to childbirth but not those relating to abortion. In *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the Court upheld a statute that provided Medicaid recipients with payments for medical services related to childbirth but denied such payments for nontherapeutic abortions. In doing so, it noted that "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." 432 U.S. at 475, 97 S.Ct. at 2383. It also noted that the constitutional right of privacy recognized in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) "implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." 432 U.S. at 474, 97 S.Ct. at 2382. In *Har-*

ris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Court upheld the constitutionality of the Hyde Amendment, which denies public funds for some medically necessary abortions. The Court explained that that provision "places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy, but rather, by means of unequal subsidization of abortion and other medical services, encourages alternative activity deemed in the public interest." Id. at 315, 100 S.Ct. at 2687.

The Supreme Court had occasion to revisit Maher and McRae in its recent decision in Webster v. Reproductive Health Services, — U.S. —, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). In Webster, the Court upheld against a variety of constitutional challenges a Missouri statute providing inter alia that no public facilities or employees be used to perform abortions and that physicians conduct viability tests prior to performing abortions.

The Court reaffirmed the vitality of the Maher–McRae line of cases in its discussion of the Missouri statute's prohibition on the use of public resources for the performance of abortions, quoting its decision in DeShaney v. Winnebago County Dep't of Social Servs., — U.S. —, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), to explain that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Webster, 109 S.Ct. at 3051 (quoting DeShaney, 109 S.Ct. at 1003).

The Court of Appeals in Webster had ruled that Missouri's proscription on the use of public facilities or employees in abortion services ran afoul of Roe v. Wade because it "prevent[ed] access to a public facility" and therefore "clearly narrow[ed] and in some cases foreclose[d] the availability of abortion to women." Reproductive Health Service v. Webster, 851 F.2d 1071, 1081 (8th Cir.1988). The Supreme Court disagreed, stating that the Court of Appeals' analysis was not materially different from the argument rejected in Maher and

McRae. Webster, 109 S.Ct. at 3052. "As in those cases," the Court stated, "the State's decision here to use public facilities and staff to encourage childbirth over abortion 'places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy.' " Id. (quoting McRae, 448 U.S. at 315, 100 S.Ct. at 2687). Because the funding restrictions upheld in McRae and Maher were constitutionally permissible despite their potential limits upon the choices of women seeking abortions, the Court found that "it strains logic" to suggest that a similar restriction on the use of public facilities and employees would be constitutionally infirm, id., and pointed out that "[i]f the State may 'make a value judgment favoring childbirth over abortion and ... implement that judgment by the allocation of public funds,' surely it may do so through the allocation of other public resources, such as hospitals and medical staff." Id. (citation omitted) (quoting Maher, 432 U.S. at 474, 97 S.Ct. at 2382).

We do not disagree with our dissenting colleague that the regulations in question may hamper or impede women in exercising their right of privacy in seeking abortions. Webster, however, emphasized that so long as no affirmative legal obstacle to abortion services is created by a denial of the use of governmental money, facilities, or personnel, the practical effect of such a denial on the availability of such services is constitutionally irrelevant. Certainly, an outright prohibition on the performance of any particular medical procedure in public hospitals or clinics will, if they constitute a substantial portion of such facilities in a local market, make provision of the particular service more expensive and less available. In Webster, Missouri denied the provision of abortion services in all public facilities, including hospitals, in order to "encourage childbirth over abortion." 109 S.Ct. at 3052. This seems to us a prohibition substantially greater in impact than the regulations challenged in the instant matter. Since these regulations create no affirmative legal barriers to access to abortion, therefore, Webster clearly refutes the

privacy claims raised by plaintiffs.[3] For these reasons, we also believe that *Webster* cannot be reconciled with the recent decision of the First Circuit in *Massachusetts v. Secretary of Health and Human Servs.*, No. 88–1279, slip op. at 26–40 (1st Cir. May 8, 1989) (holding regulations unconstitutional because they pose an obstacle to abortion), *opinion withdrawn and en banc rehearing granted*, (order of Aug. 9, 1989).

▉ With regard to speech rights,[4] the Secretary's implementation of Congress's decision not to fund abortion counseling, referral or advocacy also does not, under applicable Supreme Court precedent, constitute a facial violation of the First Amendment rights of health care providers or of women. The Court has extended the doctrine that government need not subsidize the exercise of fundamental rights to speech rights. In *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), a nonprofit group, Taxation with Representation ("TWR"), claimed that the prohibition against substantial lobbying by organizations exempt from tax under I.R.C. § 501(c)(3) imposed an "unconstitutional condition" on the receipt of tax-deductible contributions. The Supreme Court, in rejecting this contention, stated:

> The [Internal Revenue] Code does not deny TWR the right to receive deductible contributions to support its non-lobbying activity, nor does it deny TWR any independent benefit on account of its intention to lobby. Congress has merely re-

fused to pay for the lobbying out of public moneys. This Court has never held that Congress must grant a benefit such as TWR claims here to a person who wishes to exercise a constitutional right.

461 U.S. at 545, 103 S.Ct. at 2001. It again noted that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Id.* at 549, 103 S.Ct. at 2002. "The reasoning of these decisions is simple: 'although government may not place obstacles in the path of a [person's] exercise of ... freedom of [speech], it need not remove those not of its own creation.'" *Id.* at 549–50, 103 S.Ct. at 2002–03 (quoting *McRae*, 448 U.S. at 316, 100 S.Ct. at 2688); *see also DKT Memorial Fund v. Agency for Int'l Dev.*, 887 F.2d 275, 286–294 (D.C.Cir. Oct. 10, 1989) (abortion-related restrictions on use of funds by international population planning program upheld as mere refusal to subsidize particular exercise of speech rights).

In addition, appellants argue that the restrictions on the subsidization of speech contained in the regulations are impermissible because the government may not condition receipt of a benefit on the relinquishment of constitutional rights. *See Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Taxation With Representation*, 461 U.S. at 545, 103 S.Ct. at 2001. This case is distinguishable from *Perry*, however, because individuals employed by Title X projects remain free to say whatever they wish about abortion outside the Title X project. *See* 42

---

**3.** Title 42 C.F.R. § 59.8(a)(3) (1988) prohibits Title X providers from "excluding available providers who do not provide abortions." This language was not intended to prevent a Title X grantee from excluding a facility that it regards as medically unsound for reasons other than its failure to provide abortions. As the discussion accompanying the regulations makes clear, the language was intended only to prevent "the deliberate exclusion in the composition of the list of providers that do not provide abortions or referrals for abortion." 53 Fed.Reg. at 2938. Title 42 C.F.R. § 59.8(b)(4) prohibits the exclusion of "appropriate providers which do not provide or refer for abortions." The word "appropriate" leaves room for judgments as to the medical worthiness of such providers and the

portion of the discussion quoted above applies to (b)(4) as well.

**4.** One of the provisions of the Missouri statute at issue in *Webster* prohibited the use of public funds, personnel or facilities for the purpose of "encouraging or counseling" a woman to have an abortion not necessary to save her life, and the *Webster* plaintiffs had attacked that section of the statute on First Amendment grounds in the Court of Appeals. *See Reproductive Health Service v. Webster*, 851 F.2d 1071, 1078 (8th Cir.1988). Plaintiffs, however, abandoned that claim before the Supreme Court, rendering the question moot, so we do not have the benefit of an explicit decision on the First Amendment issues implicated there.

C.F.R. § 59.10(b)(6), (7) (1988). *Perry*, by contrast, involved a situation in which an individual was penalized precisely for exercising First Amendment rights outside the scope of his employment.

We do not regard the "program integrity" regulations as permitting the Secretary to deny funding to health care providers because they employ personnel who perform or counsel abortions outside their employment by the Title X grantee. *Cf. Webster v. Reproductive Health Servs.*, —— U.S. ——, 109 S.Ct. 3040, 3052 n. 8, 106 L.Ed.2d 410 (1989) ("This case might ... be different if the State barred doctors who performed abortions in private facilities from the use of public facilities...."). Although "[t]he existence of separate personnel" may be considered under 42 C.F.R. § 59.9(c) (1988) in determining whether Title X facilities are in fact separate from, and independent of, abortion-related facilities, the Secretary must consider numerous other factors, including distinct accounting records, physical separation, and the degree to which signs and other written indicia denote the two as separate facilities. 42 C.F.R. § 59.9 (1988). Thus "[w]here sharing of personnel exists, but the project can demonstrate on an overall basis that it is objectively separated from prohibited activities, the Department will determine that the project is in compliance with § 59.9." 53 Fed.Reg. at 2941. In addition, the regulations do not authorize the Secretary to take the non-Title X employment activities of personnel into account in determining whether to grant a facility Title X status.

Our dissenting colleague relies upon *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) and *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983). These cases, however, involved laws that regulated the flow of information from doctors to patients without regard to whether public funds were being used. Given the numerous Supreme Court decisions discussed *supra* that distinguish between direct regulation and conditions on public funding, neither *Thornburgh* nor *City of Akron* con-

trol the present action. *See also DKT Memorial Fund*, 887 F.2d at 286–287.

We also note that the decision in *Republican Nat'l Comm. v. Federal Election Comm'n*, 487 F.Supp. 280 (S.D.N.Y.1980) [hereinafter *RNC*], *certified questions answered*, 616 F.2d 1 (2d Cir.1980), *aff'd*, 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980), supports our conclusion. In *RNC*, plaintiffs argued that conditioning the public funding of a presidential campaign on the observance of limits on expenditures, held to be unconstitutional in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), deprived candidates and their supporters of their First Amendment rights. The three-judge district court held that "[w]hile Congress may not condition benefit on the sacrifice of protected rights, the fact that a statute requires an individual to choose between two methods of exercising the same constitutional right does not render the law invalid, provided the statute does not diminish a protected right." 487 F.Supp. at 284–85 (citations omitted). In the instant case, potential grantees may seek funding from the states or other governmental units or from private sources as well as from the federal government, subject only to the separation requirements described above. In contrast, *RNC* upheld a statutory scheme in which candidates are compelled to select either exclusively public or exclusively private funding. Moreover, under *RNC*, the candidates' choice is further circumscribed because the alternative of private fundraising is subject to stringent limits on the size of permissible contributions. *See* 2 U.S.C. § 441a (1988). Title X does not compel any such one-or-the-other choice and is not accompanied by statutory constraints on alternative sources of funding.

Finally, we add two qualifications. First, the present action does not pose the issues that might arise if a doctor were to treat private patients in an entity that receives Title X funds. In such a situation, the regulations limiting the role of Title X clinics with regard to abortion might be read to preclude the physician from giving advice concerning abortions to a patient who

was in the clinic, not to take advantage of the services it offers as a Title X grantee, but to see her regular doctor. This issue appears to have been raised in *Webster* with regard to physicians in state-supported hospitals but mooted before the Supreme Court decision. *See supra* note 4; *Reproductive Health Services v. Webster,* 662 F.Supp. 407, 427–28 (W.D.Mo.1987). Whether this issue arises in the context of Title X clinics is not clear on the present record, and we do not reach it.

Second, we note that the regulations in question do not facially discriminate on the basis of the viewpoint of the speech involved. The regulations require that requests for information on abortion be answered by the factual statement that the particular program does not include it as a family planning method and that only prenatal services other than abortion are offered. Argumentation pro or con as to the advisability of an abortion for a particular woman is neither required nor authorized. The woman is thus under no pressure as a result of the regulations to accept or reject the services offered. Nor do the regulations in any way suggest that Title X funds may be used for public anti-abortion advocacy. Should the actual effect of the regulations be otherwise, the issues raised thereby can be resolved on a proper record.[5]

### CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

CARDAMONE, Circuit Judge, concurring:

I concur in Judge Winter's thorough opinion to affirm because I agree that the regulations promulgated by the Secretary are permissible under Title X, and are not constitutionally infirm. If experience under the regulations proves otherwise, a challenge may later be raised and resolved. I write separately to express two concerns.

The first concern is directed at the regulation requiring the Secretary to consider "[t]he existence of separate personnel" as a factor in determining the "objective integrity and independence [from abortion-related facilities]" of Title X facilities. *See* 42 C.F.R. § 59.9(c) (1988). This factor allows the Secretary in allocating Title X funding to consider whether Title X health-care providers perform or counsel abortions outside of their employment. The concern this raises is whether the Secretary may withhold funding from health-care providers based upon their exercise of First Amendment rights outside the scope of their Title X employment; a course of action explicitly found unconstitutional in *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *see also Webster v. Reproductive Health Servs.,* —— U.S. ——, 109 S.Ct. 3040, 3052 n. 8, 106 L.Ed.2d 410 (1989) ("This case might ... be different if the State barred doctors who performed abortions in private facilities from the use of public facilities....").

Despite my concerns under *Perry,* I do not believe § 59.9(c) is constitutionally unsound. The regulation's plain language indicates that the Secretary will consider the existence of separate personnel in conjunction with several other factors: the maintenance of distinct accounting records, the physical separation of facilities, and the degree to which signs and other written indicia denote the two as separate facilities. Thus, "[w]here sharing of personnel exists, but the project can demonstrate on an overall basis that it is objectively separated from prohibited activities, the Department will determine that the project is in compliance...." 53 Fed.Reg. 2922, 2941 (1988). In addition, there is no evidence in the record before us that the Secretary has relied or intends to rely upon the non-Title X employment activities of personnel in determining whether to grant a facility Title X status.

---

5. For these reasons, we again disagree with the decision in *Massachusetts v. Secretary of Health and Human Servs.,* No. 88–1279, slip op. at 41–43 (1st Cir. May 8, 1989) (holding that regulations violate First Amendment), *opinion withdrawn and en banc rehearing granted,* (order of Aug. 9, 1989).

The second concern relates to the regulations insofar as they do not permit Title X attending physicians to provide the Yellow Pages found in an ordinary telephone book to a patient requesting information about health-care providers who perform and counsel patients regarding abortions. The Secretary's oral and written interpretations of the regulations state that Title X grantees may "keep[ ]" but not "provi[de]" the Yellow Pages. *See* 53 Fed.Reg. 2922, 2942 (1988). In addition, the plain language of § 59.8(a)(3) prohibits the inclusion of "health care providers whose principal business is the provision of abortions" in referral lists given to patients. Because such facilities are listed in the Yellow Pages, this regulation bars their use as a reference source for Title X patients.

Under the regulations, a Title X physician's hands are tied with respect to the response he or she may give to a patient seeking abortion information. Crafting the regulations in this fashion constitutes a trap for the mostly unsophisticated and unwary patients,[1] and jeopardizes the ability of Title X physicians to safeguard the health of those seeking their expert advice. For example, a Title X grantee *must* refer patients to facilities that do not perform or counsel abortions, *see* 42 C.F.R. § 59.8(a)(3) & (b)(4) (1988), regardless of whether the grantee believes the facility is sound medically or not. Moreover, the list must include *all* such facilities because the Secretary has ruled that excluding *any* such provider is inappropriate under Title X. The dilemma that comes to mind occurs when the Title X grantee knows that a health-care provider that does not perform or counsel abortions is—in the physician's opinion—not medically of high quality, but must nonetheless list that facility as a proper reference to a patient seeking the grantee's advice.

When faced with a somewhat analogous predicament, the Supreme Court, address-

ing the issue of what information must be supplied by a physician to facilitate a patient's "informed consent," declined to define the information provided by the physician narrowly. Rather, the Court required only that the physician indicate "what would be done and ... its consequences" because a more detailed definition "might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession." *Planned Parenthood v. Danforth*, 428 U.S. 52, 67 n. 8, 96 S.Ct. 2831, 2840 n. 8, 49 L.Ed.2d 788 (1976).

It strikes me that a regulation allowing the Yellow Pages to be "kept" but not "provided" is a small and petty contrivance, inconsistent with our nation's high principles. Hence, although I vote to affirm because the subject regulations meet the letter of the law, I must say that in my view they fall woefully short of the tolerant spirit that gave birth to and should continue to animate our constitutional system.

KEARSE, Circuit Judge, dissenting in part:

I respectfully dissent from so much of the judgment as upholds the new regulations promulgated by the Secretary of Health and Human Services with respect to abortion counseling and referrals. Even assuming that the Secretary's new interpretation of Title X, 42 U.S.C. §§ 300 et seq. (1982 & Supp. V 1987), is entitled to deference, I view these regulations as arbitrary and capricious and as violative of rights guaranteed by the Constitution.

Section 59.8(a)(1) of the new regulations, *see* 42 C.F.R. §§ 59.7–59.10 (1988), entitled in part "Prohibition on counseling and referral for abortion services," provides that a "Title X project may not provide counseling concerning the use of abortion ... or provide referral for abortion." There can be no doubt that the Secretary intends this regulation to forbid a grantee from inform-

---

1. It has been said that Title X, as the single largest federally-funded family planning program, serves 4.3 million people: its targeted population consists of an estimated 14.5 million women at risk of unintended pregnancy, including 5 million adolescents between the ages of 15

and 19, and 9.5 million adult women between the ages of 20 and 44, all of whom have an income 150 percent below the poverty level. Note, *The Title X Family Planning Gag Rule: Can the Government Buy Up Constitutional Rights?*, 41 Stan.L.Rev. 401, 408 (1989).

ing a pregnant woman of the availability of abortion and even from telling her where she can get abortion-related information. For example, though the regulations permit a grantee to give the woman a list of prenatal-care service providers that might also offer abortions, the list must comply with several requirements. It *must* include any available prenatal-care providers that *do not* perform abortions; it *cannot* include providers that offer abortions as their "principal business"; and it cannot "weigh[ ]" in favor of abortion providers. 42 C.F.R. § 59.8(a)(3). The grantee is not allowed to inform the woman which providers on the list, in addition to offering prenatal care, also perform abortions. Rather, care providers that also perform abortions may be included only if *"the referral* is *specifically* made to the providers of *prenatal* care services." 53 Fed.Reg. 2922, 2938 (1988) (emphasis added). Indeed, the grantee is required to inform the client about care to preserve the unborn fetus. Section 59.8(a)(2), for example, provides that "once a client served by a Title X project is diagnosed as pregnant, she must be referred for appropriate prenatal and/or social services *by furnishing a list of available providers that promote the welfare of mother and unborn child."* (Emphasis added.)

The majority states that the regulations "do not facially discriminate on the basis of viewpoint of the speech involved," that they do not authorize argumentation "pro or con" as to the advisability of abortion, and that they do not suggest "in any way" that Title X funds may be used for advocacy against abortion. I submit that precisely the opposite is plain from the face of the regulations. In addition to the regulations discussed above, for example, § 59.8(b)(4) provides that when a woman asks for a list of abortion providers, the grantee is not permitted to give her a list that includes entities whose principal business is abortion, or a list that does not include "providers of prenatal care in the area which *do not* provide or refer for abortions." (Emphasis added.) In contrast, § 59.8(b)(5) provides that when a woman asks for information on abortion, the grantee is permitted to "tell[ ] her that the project does not

consider abortion an appropriate method of family planning and therefore does not counsel or refer for abortion"; it is permitted to "tell[ ] the client that the project can help her to obtain prenatal care and necessary social services, and provide[ ] her with a list of such providers from which the client may choose."

Thus, the express prescriptions and proscriptions in the regulations require the grantee to emphasize prenatal care and prohibit it from identifying any entity as a provider of abortions. Plainly, the regulations facially discriminate on the basis of viewpoint and control the content of the grantee's permitted speech.

In *Regan v. Taxation With Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), the Supreme Court warned that the government may not, consistent with First Amendment constraints, manipulate subsidy programs in a way " 'ai[med] at the suppression of ... ideas' " it considers undesirable. *Id.* at 548, 103 S.Ct. at 2002 (quoting *Cammarano v. United States,* 358 U.S. 498, 513, 79 S.Ct. 524, 533, 3 L.Ed.2d 462 (1959)). In my view, just such an impermissible manipulation has occurred here.

This content restriction is all the more pernicious because it deprives a woman of her constitutionally protected right, recognized in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), to choose whether or not she will have an abortion. The regulations at issue here prohibit the physician in a Title X facility from communicating to his patient frank and complete advice if it involves consideration of abortion. They require him, in referring his patient to other health-care providers, to identify only prenatal-care facilities. If his pregnant patient raises the subject of abortion, he is required to tell her that he cannot give her any advice or counseling on the subject. If she asks where she can get information, the regulations prohibit even an informative response.

Though the majority seems to believe that it is sufficient that the grantee is allowed to keep the "yellow pages" in its offices, a telephone book seems a poor substitute for the advice of one's doctor. Fur-

ther, the Secretary's interpretations of the regulations, both written and oral, reveal that the Title X grantee is not even allowed to refer the woman to the yellow pages. Thus, the written interpretation of the regulations says merely that the grantee may "keep[ ]" the yellow pages, while in the same sentence referring to *other* information that may be "provi[ded]." 53 Fed. Reg. 2922, 2942 (1988). There is no indication in the written interpretation that the yellow pages may be "provided," and at oral argument of this appeal, the Secretary stated that they could not.

By damming the flow of information from physician to patient, the Secretary's regulations impermissibly impede a woman's exercise of her constitutional privacy right. Time and again, the Supreme Court has emphasized that governmental regulation violates a woman's right to choose between childbirth and abortion when it interferes with the information and advice she may be given by her physician. In *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) ("*Akron*"), the Court stated that "a pregnant woman must be permitted, in consultation with her physician, to decide to have an abortion and to effectuate that decision 'free of interference by the State.' " *Id.* at 429–30, 103 S.Ct. at 2492–93 (quoting *Roe v. Wade*, 410 U.S. at 163, 93 S.Ct. at 731). In *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) ("*Thornburgh* "), the Court disapproved a requirement that a physician provide a woman with a list of agencies offering alternatives to abortion, finding it to be "nothing less than an outright attempt to wedge the [state]'s message discouraging abortion into the privacy of the informed-consent dialogue between the woman and her physician." *Id.* at 762, 106 S.Ct. at 2179.

Unlike the regulatory schemes in such cases as *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), and *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), in which the regulating authority was found merely to have refused to extend an affirmative benefit to women who freely chose abortion, but not to have placed obstacles in the way of an informed choice, the Secretary's regulations here plainly interfere with the pregnant woman's freedom to decide which course of action she prefers. In some cases, the information ban will delay the appropriate education of the patient to such an extent that she is denied any genuine choice. In some cases, the patient will never be fully informed, for as the Secretary has acknowledged, "[f]or many clients, family planning programs are their only continuing source of health information and medical care." U.S. Dep't of Health and Human Services, *Program Guidelines for Project Grants for Family Planning Services* § 9.4 (1981). These regulations prevent such a program from giving the client any substantive information regarding abortion as an option; if she asks where she may obtain such information, her Title X physician is prohibited from telling her.

By prohibiting the delivery of abortion information and prohibiting communication even as to where such information can be obtained, the present regulations deny a woman her constitutionally protected right to choose. She cannot make an informed choice between two options when she cannot obtain information as to one of them.

In sum, I would rule that just as a "State may not require the delivery of information designed 'to influence the woman's informed choice between abortion or childbirth,' " *Thornburgh*, 476 U.S. at 760, 106 S.Ct. at 2177 (quoting *Akron*, 462 U.S. at 444, 103 S.Ct. at 2500), the government may not forbid the delivery of certain information in order to promote an uninformed choice.

I would also rule that the new regulations on counseling and referral are arbitrary and capricious. Certainly the proscription of § 1008, *i.e.*, that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning," 42 U.S.C. § 300a–6, does not on its face require a ban on the communication of information or on grantees' directing a pregnant woman to a non-Title X entity from which she can obtain information and counseling on abor-

418

tion. The Secretary's prior interpretation was that "the provision of information concerning abortion services [and] mere referral of an individual to another provider of services for an abortion ... are not considered to be proscribed by § 1008."

Nor has practice suggested that the Secretary's about-face was needed for enforcement purposes. Regulations embodying the prior interpretation were in effect for some 17 years, and the Secretary cites no abuse of the prior regulatory scheme. Indeed, a 1982 report of the U.S. General Accounting Office, following review of grantee compliance with the strictures of Title X and the regulations thereunder, found "no evidence that title X funds had been used for abortions or to advise clients to have abortions," and "no indications that any women were ... encouraged to have abortions." Rather, at oral argument of this case in the district court, the Secretary admitted that his new regulations were the result of a shift in the political climate. Thus, he stated that

it is certainly true that one of the prime reasons for these regs is a stricter enforcement of the separation of abortion as family planning from Title X programs. That is a matter of policy. It is a matter of politics.