**WEST VIRGINIA ASSOCIATION OF COMMUNITY HEALTH CENTERS, INC.; West Virginia Primary Care Study Group, Inc.; Women's Health Center of West Virginia, Inc.; Shenandoah Community Health Center of Intercounty Health, Inc.; Putnam Birthplace; West Virginia Section of the American College of Obstetricians and Gynecologists; West Virginia Department of Health, David K. Heydinger, M.D., Director, Plaintiffs,**

v.

**Louis SULLIVAN, Secretary, U.S. Department of Health and Human Services, Defendant.**

**Civ. A. No. 2:89–0330.**

United States District Court, S.D. West Virginia, at Charleston.

March 1, 1990.

E. Dandridge McDonald, Maria Fakadej, Charleston, W.Va., James L. Feldesman,

Susan D. Lauscher, Washington, D.C., Christine Marie Hedges, Spencer, W.Va., Kirk B. Johnson, Edward B. Hirshfeld, David Orentlicher, American Medical Ass'n, Chicago, Ill., Anne E. Allen, Washington, D.C., Jack R. Bierig, David F. Graham, Richard D. Raskin, Lynn D. Fleisher, Chicago, Ill., Don R. Sensabaugh, Jr., Barbara Freedy, Larry L. Rowe, Charleston, W.Va., Kent Masterson Brown, Lexington, Ky., Dan Hardway, Charleston, W.Va., Paul Clay, Fayetteville, W.Va., Clarke D. Forsythe, Kevin J. Todd, Chicago, Ill., for plaintiffs.

Michael W. Carey, U.S. Atty., Stephen M. Horn, Asst. U.S. Atty., Charleston, W.Va., James R. Bolton, Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court upon the motion of the plaintiffs West Virginia Association of Community Health Centers, Inc., Women's Health Center of West Virginia, Inc., Shenandoah Community Health Center of Intercounty Health, Inc., Putnam Birthplace, West Virginia Primary Care Study Group, the West Virginia Section of the American College of Obstetricians and Gynecologists, and Dr. David K. Heydinger, Director of the West Virginia Department of Health, to enjoin the United States Department of Health and Human Services (hereinafter, "HHS") from enforcing the new regulations found at 42 C.F.R. §§ 59.1—59.17 (1988), which affect the distribution of Title X benefits. Having obtained the agreement of all counsel, plaintiff's motion for a preliminary injunction shall be treated as a motion for final declaratory and injunctive relief on the merits. The record before the court consists of various affidavits and exhibits, as well as the pleadings.

*Background*

On February 2, 1988, new regulations under Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–6 (1982) were issued at 53 Fed.Reg. 2922. The asserted goal of the amended regulations was to assure compliance by family-planning "projects" with section 1008 of Title X, which stipulates that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a–6. Since 1972, the Department interpreted section 1008 as prohibiting Title X projects from providing abortions and from promoting or encouraging abortions. 53 Fed.Reg. 2922, 2923 (Feb. 2, 1988). However, "the Department generally took the view that activity which did not have the immediate effect of promoting abortion or which did not have the principal purpose or effect of promoting abortion was permitted." *Id.* In 1981, HHS issued revised Title X guidelines expanding on the activities permitted. These guidelines:

> [R]equired nondirective "options counsleing [sic]" on pregnancy termination (abortion), prenatal care, and adoption and foster care when a woman with an unintended pregnancy requests information on her options, followed by referral for these services if she so requests. These guidelines were premised on a view that "non-directive" counseling and referral for abortion were not inconsistent with the statute and were justified as a matter of policy in that such activities did not have the effect of promoting or encouraging abortion.

*Id.*[1]

The regulations in dispute here alter the agency's interpretation of the section 1008 prohibition by redefining the terms "family planning" services and "Title X project

---

1. Specifically, the 1981 guidelines provided that:
 Pregnant women should be offered information and counseling regarding their pregnancies. Those requesting information on options for the management of an unintended pregnancy are to be given non-directive counseling on the following alternative courses of action, and referral upon request:

 —Prenatal care and delivery
 —Infant care, foster care, or adoption
 —Pregnancy termination.
 BCHS, United States Department of Health and Human Services, Program Guidelines for Project Grants For Family Planning Services at 13 (1981).

funds," by prohibiting Title X projects from engaging in abortion counseling and referral services, by mandating physical and financial separation of Title X projects from projects providing abortion services, and by prohibiting Title X projects from engaging in certain abortion-related activities.[2] "Family planning" is redefined so as to encompass only preconception services and exclude pregnancy care.[3] § 59.2. The definition of "Title X project funds" is expanded to include "all funds allocated to the Title X program, including but not limited to grant funds, grant-related income or matching funds." *Id.*

Section 59.8 prohibits abortion counseling and referral by providing:

(a)(1) A Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning.

(2) Because Title X funds are intended only for family planning, once a client served by a Title X project is diagnosed as pregnant, she must be referred for appropriate prenatal and/or social services by furnishing a list of available providers that promote the welfare of mother and unborn child. She must also be provided with information necessary to protect the health of mother and unborn child until such time as the referral appointment is kept. In cases in which emergency care is required, however, the Title X project shall be required only to refer the client immediately to an appropriate provider of emergency medical services.

(3) A Title X project may not use prenatal, social service or emergency medical or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning, such as by weighing the list of referrals in favor of health care providers which perform abortions, by including on the list of referral providers health care providers whose principal business is the provision of abortions, by excluding available providers who do not provide abortions, or by "steering" clients to providers who offer abortion as a method of family planning.

(4) Nothing in this subpart shall be construed as prohibiting the provision of information to a project client which is medically necessary to assess the risks and benefits of different methods of contraception in the course of selecting a method; *provided,* that the provision of this information does not include counseling with respect to or otherwise promote abortion as a method of family planning. § 59.8(a)(1–4).

In addition to prohibiting abortion counseling or referrals, the new regulations prohibit a Title X project from using any of its funds for abortion-related services, including income from other sources in the form of grant-related income or private matching funds. § 59.2. Under section 59.-9, a Title X project must be organized so that it has "objective integrity and independence from prohibited activities," such as counseling and referral for abortions. The criteria to be used in making this determination include the degree of physical separation of facilities, the existence of separate personnel and accounting records, and the extent to which the Title X project is separately identified and kept free from material promoting abortion. The agency's commentary to the final rules states that the separation requirement will be determined on a case-by-case basis with no one factor being determinative so long as the separation is "visible." 53 Fed.Reg. 2922, 2940 (Feb. 2, 1988). In order to meet this requirement, the plaintiffs suggest that many Title X grantees will be unable to maintain their Title X project at the same location as facilities providing abortion-related services.

Finally, the new provisions contained in section 59.10 prohibit any activities which promote or advocate abortion as a method of family planning:

---

**2.** The relevant portions of the new regulations are set out in full and attached hereto as Appendix A.

**3.** The definition of "family planning" is set out in full in § 59.2 of Appendix A.

(a) A Title X project may not encourage, promote or advocate abortion as a method of family planning. This requirement prohibits actions to assist women to obtain abortions or increase the availability or accessibility of abortion for family planning purposes. Prohibited actions include the use of Title X project funds for the following:

(1) Lobbying for the passage of legislation to increase in any way the availability of abortion as a method of family planning;

(2) Providing speakers to promote the use of abortion as a method of family planning;

(3) Paying dues to any group that as a significant part of its activities advocates abortion as a method of family planning;

(4) Using legal action to make abortion available in any way as a method of family planning; and

(5) Developing or disseminating in any way materials (including printed matter and audiovisual materials) advocating abortion as a method of family planning.

§ 59.10(a)(1–5).

Absent the granting of further injunctive relief, the new regulations are scheduled to be implemented by defendant in the State of West Virginia on March 1, 1990. Plaintiffs West Virginia Association of Community Health Centers and West Virginia Primary Care Study Group are membership organizations of community health centers and clinics that receive Title X funds. Plaintiff West Virginia Section of the American College of Obstetricians and Gynecologists is an organization of 129 obstetricians and gynecologists practicing in West Virginia, and includes members providing services in Title X clinics. Plaintiffs Women's Health Center of West Virginia, Inc., and the Shenandoah Community Health Center of Intercounty Health, Inc., are recipients of Title X funds from the state. Plaintiff Dr. David K. Heydinger, in his official capacity as director of the West Virginia Department of Health, is the grantee of all Title X funds awarded in West Virginia by the defendant, Louis Sullivan, Secretary of the United States Department of Health and Human Services. Plaintiffs represent a class of 117 organizations which receive Title X assistance from the West Virginia Department of Health.[4]

Three issues arise for consideration by the court: (A) whether HHS exceeded its statutory authority in enacting the new regulations; (B) whether the new regulations are constitutional; and (C) whether any regulations found to be invalid may be severed from the regulations as a whole.

## I. CONGRESSIONAL INTENT

■ The initial issue is whether HHS exceeded its statutory authority in enacting

---

**4.** Prior to the commencement of this action, three other lawsuits were brought challenging the new regulations: *Massachusetts v. Bowen,* 679 F.Supp. 137 (D.Mass.1988), *aff'd sub nom. Massachusetts v. Sullivan,* 873 F.2d 1528 (1st Cir.1990) (advance sheets), *reh'g granted, opinion vacated and withdrawn,* 873 F.2d 1528 (1st Cir.1989), *reh'g scheduled* Dec.1989, No. 88–1279 (1st Cir. order entered Aug. 9, 1989); *Planned Parenthood Educ. of America v. Bowen,* 680 F.Supp. 1465 (D.Colo.1988); and *New York v. Bowen,* 690 F.Supp. 1261 (S.D.N.Y.1988), *aff'd sub nom. New York v. Sullivan,* 889 F.2d 401 (2d Cir.1989) (upholding the new regulations in their entirety). In *Planned Parenthood,* the Colorado district court granted an injunction which applies to all but one member of the Planned Parenthood Federation of America. Subsequently, the United States District Court of Massachusetts granted an injunction in *Massachusetts v. Bowen,* that applies to all members of the National Family Planning and Reproductive Health Association (hereinafter, "NFPRHA").

Observing that NFPRHA represents nearly 75% of all Title X recipients, the Massachusetts district court stated, "I assume that the Secretary, as a responsible public official, will apply this judicial determination evenhandedly to all similarly situated entities in the United States." 679 F.Supp. at 148. The National Family Planning and Reproductive Health Association and Planned Parenthood members combined receive approximately 85% of all Title X funding. West Virginia's Title X clinics are not covered by the two injunctions; the State of West Virginia did not join NFPRHA until after the court order in *Massachusetts v. Bowen* and the court has since refused to modify its injunction and add new NFPRHA members to the protected class. On February 23, 1989, defendant stated in an address to NFPRHA that "the Department is proceeding with implementation where not enjoined. The regulations are implemented as new grant awards are made." Address by Nabers Cabanis to NFPRHA at 8 (Feb. 23, 1989).

the new regulations in that, as claimed by plaintiffs, they are contrary to the clear intent of Congress. In *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), the United States Supreme Court set forth a two-step process for judicial review of an agency's construction of the statute it is administering:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

In determining Congressional intent, the court must look to the totality of the circumstances surrounding the legislation, specifically examining the following elements: (1) the statute's language; (2) contemporaneous legislative history; (3) early and subsequent constructions of the statute by HHS; and (4) subsequent legislation which reveals the Congressional purpose in enacting the statute. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108–20, 100 S.Ct. 2051, 2056–62, 64 L.Ed.2d 766 (1980).

In applying the two-step analysis of *Chevron,* the court examines the four elements specified in *GTE Sylvania* to determine whether the new regulations are contrary to the clear intent of Congress. If Congress has not addressed the issues or if Congressional intent is ambiguous, the court must then apply the second step of the *Chevron* analysis and determine whether the new regulations are a permissible construction of Title X.

## A. *Statutory Language*

■ The court first examines the language of Title X, including section 1008, upon which the new regulations are based. Title X provides that "family planning projects" are those offering "a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a). Section 1008 states that "[n]one of the funds appropriated under [Title X] shall be used in programs where abortion is a method of family planning." § 300a–6. The prohibitive language of section 1008 is broad and susceptible of the varying interpretations given it by HHS. It neither expressly includes nor excludes funds for post-conception services. Section 1008 itself is silent on the issue of separate physical facilities, personnel and accounting records although the declared statutory purpose is to provide comprehensive and coordinated family planning programs in conjunction with local and regional public or nonprofit private entities. §§ 300 to 300a. Neither does section 1008 clearly express the intent of Congress with respect to the use of funds for abortion counseling and referral. No specific mention is made of the use of Title X funds for speech-related activities.

With respect to Congressional intent to include grant-related income and matching funds within the prohibition of section 1008, the statutory language is ambiguous to the extent that "funds appropriated under this subchapter" is not defined. Congress may have intended that the prohibition apply only to Title X funds. However, the statute contemplates that a Title X program will be supported in part by other funds, *see* § 300a–4(a), and Congress may have intended that a program utilizing abortion as a method of family planning would lose its Title X funding regardless of how the abortion services were funded.

Since the language of section 1008 is silent or ambiguous on the precise issues

presented here, the court looks next to the legislative history for an expression of Congressional intent.

## B. *Contemporaneous Legislative History*

In reviewing the contemporaneous legislative history of Title X, the court seeks to determine whether the new regulations violate a clear expression of Congressional intent by limiting Title X projects to preconception services, by prohibiting abortion counseling, referral, lobbying and advocacy, by requiring a "visible" separation between a Title X program and abortion-related activities, and by regulating the use of non-Title X funds received by Title X projects. The most concise source of information on what Congress intended on these issues is the Conference Report preceding the passage of Title X, which states:

> It is, and has been, the intent of both Houses that the funds authorized under this legislation be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities. The conferees have adopted the language contained in section 1008, which prohibits the use of such funds for abortion, in order to make clear this intent. The legislation does not and is not intended to interfere with or limit programs conducted in accordance with State or local laws and regulations which are supported by funds other

than those authorized under this legislation.

H.R.Conf.Rep. No. 1667, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Admin.News 5080, 5081.

Inasmuch as the Conference Report specifically refers to *preventive* family planning services, the court is unable to conclude that HHS has acted contrary to a clear expression of Congressional intent by seeking to limit Title X projects to preconception services. With respect to the questions of abortion counseling, referral, lobbying and advocacy, the Conference Report is as inconclusive as the statute itself. However, several Congressmen stated their intent that Title X funds not be used to support, encourage or promote abortion. *New York v. Bowen,* 690 F.Supp. 1261, 1266 and n. 5 (S.D.N.Y.1988); *see also* 116 Cong.Rec. 37375–76 (Nov. 16, 1970) (remarks of Rep. Dingell).[5] In the absence of any contemporaneous legislative history addressing specifically the issues of abortion counseling, referral, lobbying and advocacy, the court finds that the general expression of intent to prohibit the use of Title X funds "in programs where abortion is a method of family planning" is broad enough to encompass the prohibition imposed by the new regulations on those activities.

The final sentence of the Conference Report states: "The legislation does not and

---

**5.** Representative Dingell has subsequently stated that:

> My remarks [in the Title X enactment debate] did not suggest—either expressly or implicitly—that the [1970] legislation being considered intended or required a prohibition on non-directive counseling or referral of pregnant women to abortion facilities. Nor did they in any way intend, require or contemplate the imposition of record-keeping or distinct facilities requirements, constraints on political activity or the taking of a negative oath by clinics.

Comments of Chairman John D. Dingell, Committee on Energy and Commerce, U.S. House of Representatives, on Proposed Rules 42 C.F.R. Part 59, *reprinted in* —— Fed.Reg. ——, 33210–15 (notice Sept. 1, 1987), submitted to Secretary of HHS by letter dated October 14, 1987, p. 2.

Plaintiffs contend that Representative Dingell's subsequent remarks support their position

that Congress only intended that Title X projects neither provide nor encourage abortion as a means of family planning. The pertinent question, however, is whether HHS is acting contrary to express Congressional intent when it prohibits certain activity, not whether it could permit the activity if it saw fit to do so.

Moreover, in assessing legislative history, the United States Supreme Court has held that "ordinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history. We do not think that [a Congressman's] isolated remark ... is entitled to much weight." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980) (citation omitted). The remarks of Congressman Dingell are thus entitled to little weight in determining Congressional intent.

is not intended to interfere with or limit programs conducted in accordance with State or local laws and regulations which are supported by funds other than those authorized under this legislation." [6] This statement comports with the statutory purpose of providing a comprehensive and coordinated program of family planning services through the use of public and private non-profit entities. *See* 42 U.S.C. §§ 300a, 300a(a) (1982). It also complements the Title X goal of increasing the availability of family planning services to indigents and those with low incomes because it does not restrict the type of entity a Title X project might associate with for additional financial or medical support. Nevertheless, section 59.9 of the new regulations, if properly applied, may appropriately compel the physical and financial separation of a Title X project from abortion-related activities whose funding by Title X is prohibited by section 1008.[7]

It is further to be noted that the final sentence of the Conference Report is inconclusive as to whether Congress intended to subject grant-related income and private matching funds to the prohibitions of section 1008. It is not clear from this language whether the purpose was to restrict the use of Title X funds only or to restrict all of a Title X program's funds regardless of their source.

## C. *Agency Construction*

The United States Supreme Court has held that reviewing courts: "[S]hould respect an agency's contemporaneous construction of its founding statute, *Power Reactor Co. v. Electricians*, 367 U.S. 396, 408 [81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 1961]. Moreover, such a contemporaneous construction deserves special deference when it has remained consistent over a long period of time." *EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762

(1981). The deference due the agency's contemporaneous construction is based on the belief that it is likely to reflect Congressional intent at the time of enactment. *See St. Luke's Hosp. v. Secretary of Health & Human Services*, 810 F.2d 325, 331 (1st Cir.1987).

The agency's prior construction of section 1008 gives an indication of Congressional intent with respect to the new prohibitions on abortion counseling and referral. In 1971, in its initial interpretation of section 1008, HHS' General Counsel's office stated: "Although not entirely free from doubt, read literally the phrase 'programs where abortion is a method of family planning,' most reasonably limits the prohibition contained in section 1008 to the financial support of programs in which abortions *are provided* as a method of family planning." Memorandum from Joel M. Mangel to Louis Hellman (Apr. 20, 1971) (Plaintiffs' Ex. 4). When HHS issued new guidelines in 1981, it interpreted Title X as not only permitting but requiring non-directive option counseling on abortion and as permitting referrals for abortion as long as the woman was not otherwise assisted in obtaining an abortion. 53 Fed.Reg. 2922, 2923 (Feb. 2, 1988). The new regulations represent a departure from the agency's contemporaneous and long-standing construction of Title X and section 1008 in that they prohibit abortion counseling and referral.

The new regulation requiring Title X projects to be physically and financially separate from abortion-related activities reflects a further change in the agency's interpretation of section 1008. The agency's position since shortly after the enactment of Title X was that "a hospital offering abortions for family planning purposes, consonant with state law" would not be barred from receiving Title X funds "for the operation of a separate family planning

---

6. For purposes of this discussion, it is important to distinguish between an entity as an organization eligible to receive grant funds and a program or project. A "program" or "project" means "a coherent assembly of plans, activities and supporting resources contained within an

administrative framework." 42 C.F.R. § 59.2. An entity receiving a Title X grant may also be administering other family planning programs or projects funded through other sources.

7. *See infra,* pp. 940–941.

program which utilized only preventive family planning methods" as long as the abortion element was not so large that it was impossible to "separate eligible and non-eligible items of cost." Memorandum from Mangel to Hellman (Plaintiffs' Ex. 4 at 3). However, the agency's position has also included, the requirement that " 'the grantee must insure that [a] Title X-supported program is separate and distinguishable from those other [abortion-related] activities. Separate bookkeeping entries are not enough.' Memorandum of April 14, 1978 [from Carol Conrad to Elsie Sullivan]." *New York v. Sullivan,* 889 F.2d 401, 410 (2d Cir.1989). The agency's construction of section 1008 with respect to the physical and financial separation requirement is a factor to be considered in determining Congressional intent.

As to the prohibition against lobbying, advocacy and other speech-related activities, the agency has always taken the position that Title X funds may not be used to promote or encourage the use of abortion as a method of family planning. There is no previous agency construction of whether funds other than Title X funds are subject to the prohibition of section 1008.

While HHS's contemporaneous construction of section 1008 is helpful in determining Congressional intent, it is but one element in the totality of the circumstances to be considered. Standing alone, it does not suffice to show the unambiguous intent of Congress required in the first step of the *Chevron* analysis.

### D. *Subsequent Legislation*

The court next examines subsequent relevant Congressional legislation. Since its enactment in 1970, Congress has repeatedly reauthorized the funding for Title X, leaving its underlying policies intact. In addition, since the 1981 guidelines, Congress has rejected numerous opportunities to reverse the counseling and referral provisions [8] and has instead reauthorized Title X three times.[9]

The United States Supreme Court has held that the:

> Failure of Congress to modify [an agency's rulings] of which Congress was, by its own studies and by public discourse, constantly reminded, and Congress' awareness [thereof] when enacting other and related legislation make out an unusually strong case of legislative acquiescence in and ratification by implication of the [earlier] rulings.

*Bob Jones Univ. v. United States,* 461 U.S. 574, 599, 103 S.Ct. 2017, 2032, 76 L.Ed.2d 157 (1983). The Court noted that "[o]rdinarily, and quite appropriately, courts are slow to attribute significance to the failure of Congress to act on particular legislation.

---

**8.** See, for example, the following bills introduced in 1987 designed to end the counseling and referral practices under Title X, none of which escaped Committee: "President's Pro-Life Bill of 1987" S. 1242, 100th Cong., 1st Sess.; "Unborn Children's Civil Rights Act" S. 381, 100th Cong., 1st Sess.; "Preborn Children's Civil Rights Act of 1987" H.R. 720, 100th Cong., 1st Sess.

Subsequent legislative acts also cast some light on the intent of Congress on the issue of physical and financial separation of Title X and abortion-related services. A Congressional Report by the Senate Labor & Public Welfare Committee made upon the 1975 Reauthorization of Title X provided:

> The Committee encourages the use of funds otherwise authorized by this bill for the provision of family planning services, not only in specialty clinics, but, where such facilities do not exist or are impractical, in entities devoted to comprehensive health care for low-income families.... [I]t is essential that there be close coordination and, whenever possible, integration of family planning services into all general health care programs.

S.Rep. No. 63, 94th Cong., 1st Sess. 65–66 *(1975) reprinted in* 1975 U.S.Code Cong. & Admin. News 469, 528.

**9.** Technically, the authorization for Title X has expired. However, Title X has been kept in existence through a series of continuing resolutions/appropriations statutes. Prior to the 1981 guidelines, Congress reauthorized Title X appropriations five times. *See* Pub.L. 92–449, § 301, 86 Stat. 754, Sept. 30, 1972; Pub.L. 93–45, § 111(a), 87 Stat. 93, June 18, 1973; Pub.L. 94–63, § 202(a), 701(d), 89 Stat. 306–308, 352, July 29, 1975; Pub.L. 95–83, § 305(a), 91 Stat. 388, Aug. 1, 1977; Pub.L. 95–613, § 1(b)(1), 92 Stat. 3093, Nov. 8, 1978. Since the 1981 guidelines were implemented, Congress has authorized appropriations three times. The current such authorization for fiscal year 1990 is Continuing Appropriations, 1990, Pub.L. No. 101–100, 103 Stat. 638 (1989).

We have observed that 'unsuccessful attempts at legislation are not the best of guides to legislative intent.'" *Id.* at 600, 103 S.Ct. at 2032 (citation omitted) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 382 n. 11, 89 S.Ct. 1794, 1802 n. 11, 23 L.Ed.2d 371 (1969)). However, the Court went on to state that while "[n]onaction by Congress is not often a useful guide, ... the nonaction ... is significant" where Congress repeatedly fails to act on bills proposed on a subject of which it has a "prolonged and acute awareness." *Id.* 461 U.S. at 601, 103 S.Ct. at 2033.

Nonetheless, nonaction may be indicative of many things and even if it reflects acquiescence in an existing or earlier policy, that acquiescence is not determinative of whether the agency is acting outside the scope of its statutory authority when it changes its policy direction. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 45, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (citing *Bob Jones Univ.*, 461 U.S. at 559–602, 103 S.Ct. at 2032–33; *Haig v. Agee*, 453 U.S. 280, 291–300, 101 S.Ct. 2766, 2773–78, 69 L.Ed.2d 640 (1981)). Accordingly, Congress' failure to act is accorded little weight in determining whether the new regulations are invalid because they are contrary to the express intent of Congress.

E. *Totality of the Circumstances*

■ Upon reviewing the totality of the circumstances surrounding Congressional enactment of Title X and section 1008, the court is not persuaded that defendant lacked the facial statutory authority to enact the new regulations. The Conference Report accompanying Title X states that it is the intent of Congress to fund preventive family planning services. Since the ordinary meaning of "prevent" is to stop or keep something from happening, it cannot well be argued that the new definition of "family planning," which limits Title X programs to those providing preconception services, is an impermissible construction of section 1008. Inasmuch as all elements reviewed for indications of Congressional intent are silent or ambiguous with respect to the regulation of non-Title X monies,

inclusion of grant-related income and matching funds in the definition of "Title X project funds" cannot be said to violate a clear expression of Congressional intent.

The agency's contemporaneous construction of section 1008 permitted abortion counseling and referral, and subsequent legislation left those provisions intact. However, those factors are not a sufficiently compelling indication of Congressional intent to find that the new prohibition against abortion counseling and referral is outside the scope of the broad language of section 1008, especially in light of the contemporaneous remarks of legislators that Title X funds be used only for preventive services and not for the support, encouragement or promotion of abortion. Similarly, it cannot be said that the prohibitions against pro-abortion speech-related activities are contrary to those same contemporaneous remarks of members of Congress.

More troubling is section 59.9. While the separation requirements of section 59.9 find support in the section 1008 prohibition against the use of Title X funds in programs utilizing abortion as a method of family planning, a rigid enforcement of its provisions would require many existing clinics to either terminate their services or give up their Title X funding because of the cost of relocating or adding additional space to existing facilities. A requirement of separate personnel would also increase the cost of providing comprehensive services. By increasing the costs of family planning services and decreasing the number of facilities which can afford to stay in operation, section 59.9 has the capacity to frustrate the Congressional goal of providing comprehensive services to indigents and low income families.

So it is that, on the one hand, Title X programs are intended by Congress to be an integral part of a broader health care delivery system. On the other hand, if section 1008's restriction on the use of Title X funds is to be realized, a reasonable measure of separation between projects funded by Title X and programs for the counseling or performing of abortions must

be observed. Section 59.9 requires physical and financial separation to the end that the Title X projects have an objective integrity and independence from prohibited activities. Though not exclusive, the four stated factors from which the Secretary is to make this determination on a case-by-case basis are (a) the existence of separate accounting records, (b) the degree of separation from rooms and facilities in which prohibited activities occur and the extent of such prohibited activities, (c) the existence of separate personnel and (d) the extent to which signs and other forms of identification of the Title X project are present and signs and material promoting abortion are absent.

As earlier noted, guidelines observed prior to the new regulations included the requirement that " 'the grantee must insure that [a] Title X-supported program is separate and distinguishable from those other [abortion-related] activities. Separate bookkeeping entries are not enough.' Memorandum of April 14, 1978," *supra* p. 939. Nevertheless, most Title X projects have long shared personnel and physical facilities with abortion-related activities. It is those two factors, separate personnel and physical facilities, that merit particular attention in considering the validity of section 59.9. As to personnel, the agency, in commentary to the regulations, states that "[w]here sharing of personnel exists, but the project can demonstrate on an overall basis that it is objectively separate from prohibited activities, the Department will determine that the project is in compliance

..." 53 Fed.Reg. 2922, 2941 (Feb. 2, 1988). As to physical facilities, no similar flexibility is stated, although the agency commentary does note that all relevant factors, including the four specifically named, are to be considered and weighed on a case-by-case basis. *Id.* at 2940. It is apparent that the Secretary's application of the separation requirements may prove so stringent as to violate the intent of Congress that state and local programs not be interfered with and that comprehensive family planning services be made available to indigents and those with low income. If so, the misapplication of section 59.9 can then be the subject of an action seeking relief. At this juncture, it cannot be said that the separation requirements are contrary to Congressional intent.

Having concluded that the new regulations are not contrary to the clear intent of Congress, the court finds that they are permissible.[10]

## II. SEVERABILITY

Before examining the constitutional questions raised by the new regulations, the court will consider whether the new regulations must stand or fall in their entirety or whether the various provisions may be examined independently to the end that only constitutionally infirm portions be stricken. Severance of offensive provisions rather than invalidation of the whole is proper unless logic or law dictates an "either-or" conclusion that the regulations would not have been adopted without the

---

10. While an agency's change in a long-standing interpretation requires greater justification than when the regulations are first promulgated, the standard of review to be applied is still the arbitrary and capricious standard, with the agency's interpretation being entitled to deference unless there is no reasoned basis for the change. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual*, 463 U.S. 29, 41–44, 103 S.Ct. 2856, 2865–67, 77 L.Ed.2d 443 (1983).

In addition to arguing that the new regulations more closely conform to the intent of Congress than did the old guidelines, HHS relied upon reports by the Office of the Inspector General (OIG) and the General Accounting Office (GAO) as a basis for promulgating the new regulations. 53 Fed.Reg. 2922, 2923–25 (Feb. 2, 1988). The OIG report had found confusion

about precisely what activities were proscribed by § 1008, resulting in variations in how Title X grantees utilized Title X funds. *Id.* The GAO report found instances where Title X funds were being used for activities deemed impermissible under the statute and recommended that clear operational guidelines be incorporated into the Title X program regulations rather than continued reliance upon legal opinions issued by the Office of General Counsel. *Id.* Although the reports would justify a clarification of existing standards, they provide scant basis for the major changes reflected in the new regulations. Nonetheless, an agency is not required to "establish rules of conduct that last forever," *Motor Vehicle*, 463 U.S. at 42, 103 S.Ct. at 2866, and the court concludes that HHS provided a reasoned basis for promulgating the new regulations.

section in question. *Addison v. Holly Hill Fruit Prod., Inc.,* 322 U.S. 607, 618–19, 64 S.Ct. 1215, 1221–22, 88 L.Ed. 1488 (1944). More recently, in *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), the Supreme Court stated that the test of severability of a subsection of an agency's regulations was whether severance of the subsection would "impair the function of the statute as a whole" so that "the regulation would not have been passed but for its inclusion." *Id.* 108 S.Ct. at 1819. The result is basically a two-part inquiry involving (1) an examination of the functional independence of the section to determine whether it is an "integral" part of the whole, *see Ragsdale v. Turnock,* 841 F.2d 1358, 1375 (7th Cir. 1988), and (2) an examination of the agency's intent in enacting the regulations. *Keith Fulton & Sons v. New England Teamsters,* 762 F.2d 1124, 1136 (1st Cir. 1984). It is proper to strike only offensive portions of the regulations unless there is a "substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted." *North Carolina v. Federal Energy Regulatory Comm'n,* 730 F.2d 790, 795–96 (D.C.Cir. 1984) (citing *Addison,* 322 U.S. at 618–19, 64 S.Ct. at 1221).

■ Looking first at the question of functional independence, it is significant that the regulations being challenged are amendments to the original regulatory scheme enacted by HHS. As such, it cannot be disputed that their function is independent of the regulations first enacted under Title X. Furthermore, while the goal of all of the challenged regulations is the same, *i.e.,* to ensure that no Title X funds are used in programs where abortion is a method of family planning, each of the challenged provisions is designed to serve a different function in realizing that goal. For example, the function of the revised definition of "family planning" is to restrict Title X projects to preconception services while the function of the revised definition

of "Title X program" is to subject grant-related income and matching funds to the same restrictions as Title X monies. Even within the counseling and referral prohibitions of section 59.8, the subsections serve different functions.[11] Subsection (a)(1) serves only to prohibit counseling and referral for abortion, while subsection (a)(2) specifies the information to be given by Title X providers to their pregnant clients. Similarly, section 59.10 serves to prohibit a wide range of activities, each of which is addressed in a separate subsection.[12] Although the overall goal of the section is to prohibit pro-abortion activities, each subsection is functionally independent from the other in that it is directed at specific conduct as varied as pro-abortion lobbying and the use of Title X project funds for payment of dues to groups advocating abortion as a method of family planning. The court accordingly concludes that each of the subsections is functionally independent of the others because none of them is an integral part of the regulations as a whole.

Turning next to the question of the agency's intent in enacting the new regulations, it is clear that the goal of HHS was to more strictly enforce the prohibition of section 1008 against the use of Title X funds in programs utilizing abortion as a method of family planning. 53 Fed.Reg. 2922, 2923–24 (Feb. 2, 1988). In furtherance of that goal, the agency undertook to prohibit numerous activities it deemed to encourage, promote or facilitate abortion. Nothing suggests, however, that the agency took an "either-or" approach and intended to restrict the use of Title X funds in one area only if it could restrict their use in all areas covered by the new regulations. For example, the record would not support an argument that the agency intended to prohibit the use of Title X funds for pro-abortion lobbying only if it could also control the flow of information between Title X physicians and their pregnant clients. Rather, the record indicates quite the contrary: the agency's intent was to prohibit

---

11. The text of section 59.8(a) is set out in full *supra* p. 934 and in Appendix A.

12. The text of section 59.10(a) is set out in full *supra* pp. 934–935 and in Appendix A.

the expenditure of Title X funds for pro-abortion activities to the extent permissible under section 1008.

Having concluded that the challenged provisions of the new regulations are functionally independent and that there is no substantial doubt that HHS would have enacted some of the provisions even if it had known others were invalid, it becomes necessary to examine separately the constitutionality of each of the challenged provisions.

## III. CONSTITUTIONALITY

A. *Section 59.8: Prohibition on Counseling and Referral*

Section 59.8 [13] complements the new definition of "family planning" in section 59.2 [14] by emphasizing that Title X funds are to be used only for preconception family planning services. Title X projects are prohibited from counseling their clients about the use of abortion as a method of family planning and from providing referral for abortion as a method of family planning. § 59.8(a)(1). Section 59.8 then ranges beyond the family planning definition by providing that once pregnancy has occurred, the client must be given a list of "providers that promote the welfare of mother and unborn child" and information necessary to protect the health of both mother and unborn child until a referral appointment is kept. § 59.8(a)(2). The list that is furnished must not be weighted in a manner that "steers" clients toward providers who perform abortion services and it may not include providers whose "principal business is the provision of abortion." § 59.8(a)(3). Family planning services that fail to comply with the counseling and re-ferral regulations are not eligible to receive Title X funds. § 59.7.

Section 59.8 brings into conflict two competing interests. One is the privacy right of a pregnant woman, in conjunction with her physician,[15] to make an informed decision about terminating her pregnancy through abortion. The other is the right of government to encourage legislatively favored activities through the allocation of federal funds.

*Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), established a woman's right to decide whether to terminate her pregnancy through abortion. The right, however, is not unqualified. As the Supreme Court stated in *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), where the regulation being challenged refused funding for nontherapeutic abortions:

> *Roe* did not declare an unqualified "constitutional right to an abortion." ... Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy. It implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds.

*Id.* at 473–74, 97 S.Ct. at 2382. The Court went on to conclude that a state regulation permitting payment of the medical expenses of childbirth but not those of an abortion was not an impermissible interference with the rights recognized in *Wade:*

> The ... regulation places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suf-

---

**13.** The relevant portions of section 59.8 are set out in full *supra* p. 934 and in Appendix A.

**14.** The definition of "family planning" is set out in full in Appendix A.

**15.** While the focus is on the relationship between the woman and her physician, the protected relationship is broad enough to include those who assist the doctor in providing the woman with the information necessary to make

a decision. *See Thornburgh v. American College of Obst. & Gyn.,* 476 U.S. 747, 763, 106 S.Ct. 2169, 2180, 90 L.Ed.2d 779 (1985) (invalidating an informational requirement regardless of whether the physician or a counselor provided the material); *City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 448, 103 S.Ct. 2481, 2502, 76 L.Ed.2d 687 (1983) (invalidating a requirement that only a physician could give the information necessary for informed consent).

fers no disadvantage as a consequence of [the] decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created nor in any way affected by the ... regulation.

*Id.* at 474, 97 S.Ct. at 2382–83. The distinction made by the Court in *Maher* between permissible and impermissible conduct is the "basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Id.* at 475, 97 S.Ct. at 2383.

Subsequently, in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), where the government, under the Hyde Amendment, refused to fund certain medically necessary abortions, the Court reaffirmed *Maher* by stating that "although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category." *Id.* 448 U.S. at 317, 100 S.Ct. at 2688. The obstacle the Court found to be in the woman's path in *Harris* and *Maher* was her indigency. Since the obstacle of indigency was not created by the challenged regulations, the Court found that there was no unwarranted governmental interference with the woman's freedom of choice on abortion. *Id.*

The Supreme Court's most recent statement about the right of government to favor childbirth over abortion by restricting the use of public resources is *Webster v. Reproductive Health Services,* —— U.S. ——, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). Part of the statute under attack in *Webster* prohibited the use of public employees or facilities for the performance of abortions. Applying the rationale of *Maher* and *Harris,* the Court upheld the prohibitions on the basis that there is "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* 109 S.Ct. at 3051 (quoting *DeShaney v. Winnebago County Dept. of Social Serv.,* 489 U.S. 189, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989)). The refusal to fund abortions does not create an obstacle to abortion, it merely "leaves a pregnant woman with the same choices as if the State had chosen not to operate any public hospitals at all." *Id.* 109 S.Ct. at 3052. There being no constitutional right to an abortion, the government "need not commit any resources to facilitating [them]." *Id.*

While *Webster* makes clear that government need not fund the performance of abortions, it offers slight guidance on the right of government to refuse funding for abortion counseling and referral. The statute in question contained three provisions relating to "encouraging or counseling a woman to have an abortion not necessary to save her life." *Id.* at 3053. Public funds could not be used for such purposes; public employees, within the scope of their employment, could not engage in speech which encouraged or counseled women to have medically unnecessary abortions, and speech which encouraged or counseled in favor of medically unnecessary abortions was forbidden in public facilities.[16] *Id.*

---

**16.** In relevant part, the statute provided:

188.205. Use of public funds prohibited, when

It shall be unlawful for any public funds to be expended ... for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life.

188.210. Public employees, activities prohibited, when

... It shall be unlawful for a doctor, nurse or other health care personnel, a social worker, a counselor or persons of similar occupation who is a public employee within the scope of his public employment to encourage or counsel a woman to have an abortion not necessary to save her life.

188.215. Use of public facilities prohibited, when

Only the public funding provision was before the Court and it was dismissed as moot.[17] In addressing the question of mootness, however, the Court stated:

> A threshold question is whether this provision reaches primary conduct, or whether it is simply an instruction to the State's fiscal officers not to allocate funds for abortion counseling. We accept, for purposes of decision, the State's claim that § 188.205 "is not directed at the conduct of any physician or health care provider, private or public," but "is directed solely at those persons responsible for expending public funds."

*Id.*

■ Because the requirements of section 59.8 are government-imposed restrictions on the use of public funds, the standards enunciated in *Maher, Harris* and *Webster* are controlling. If the requirements interfere with a woman's exercise of her protected freedom of choice on abortion by creating obstacles not otherwise present, they are impermissible. If the requirements simply reflect a value judgment favoring childbirth over abortion and the obstacles they create are not of the agency's making, they are permissible.

Subsection 59.8(a)(1) provides that "[a] Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning." Subsection (a)(1) serves only to direct those administering Title X funds not to allocate those funds to projects which provide counseling or referral for abortion.[18] It does not otherwise restrict the conduct of those providing the actual services, who remain at liberty to furnish abortion counseling or referral out of non-Title X monies. Instead, it serves to further the government's decision to subsidize only family planning services which do not provide abortion counseling and referral as a method of family planning.

■ As a funding directive, subsection (a)(1) is not an agency-created obstacle that constitutes "direct state interference" with the woman's right to an abortion. The decision of HHS not to fund abortion counseling and referral leaves the woman seeking family planning services with the same choices she would have had if the government had chosen not to provide any family planning services. Since the government has no obligation to provide any family planning services, the agency can choose to allocate funds only to those projects which do not provide abortion counseling and referral. By directing that funds be allocated for one purpose but not the other, the agency is simply implementing the value judgment made by Congress when it enacted section 1008's prohibition against the use of Title X funds for programs utilizing abortion as a method of family planning. Furthermore, as will be discussed more fully, *infra* pp. 950–954, section 59.8(1) does not prohibit a Title X grantee from using other sources of funds for abortion

It shall be unlawful for any public facility to be used ... for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life.

Mo.Ann.Stat. §§ 188.205, .210 and .215 (Vernon 1983 & 1988 Supp.), *quoted in Reproductive Health Serv. v. Webster,* 851 F.2d 1071, 1077 n. 9 (8th Cir.1988).

17. The court of appeals had found all three provisions unconstitutionally vague but did not address them separately. The state chose to appeal the decision on the public funding issue only. The public funding question was mooted by appellees' contention that they were not adversely affected by the state's interpretation of the section in question.

18. The difference in the language of § 59.8(a)(1) and § 188.205 of the Missouri statute at issue in *Reproductive Health Services* is not a significant

one for our purposes. The Missouri statute prohibited the use of public funds for the purpose of encouraging or counseling in favor of abortion, *see supra* note 16, while the regulations at issue here prohibit the Title X project from providing abortion counseling and referral. Nonetheless, the court is satisfied that § 59.8(a)(1) serves primarily to define the scope of activity that will be funded by Title X monies: only those projects which do not provide abortion counseling and referral are eligible for Title X funds. *See Planned Parenthood Ass'n of Chicago v. Kempiners,* 700 F.2d 1115, 1128 (7th Cir.1983) (interpreting a provision forbidding grantees of public funds from engaging in abortion counseling and referral as merely defining "the scope and nature of the counseling to be subsidized").

counseling and referral. The court concludes that subsection (a)(1) is not an impermissible interference with a woman's right to an abortion because it does not create an obstacle that did not otherwise exist.

Subsection (a)(1), however, must be read in conjunction with the balance of section 59.8. The new regulations having thus far limited the use of Title X funds to preventive family planning services, much of the remainder of section 59.8 is clearly directed to postconception services from which abortion counseling and referral would be banned. Particularly troublesome is subsection (a)(2), which dictates the kind of information a Title X client must be furnished once pregnancy is diagnosed. By specifying the information a pregnant woman must be given by Title X personnel, the regulations contradict the agency's stated intent to limit Title X projects to preconception services.

While the scope of a woman's right to terminate her pregnancy is not well defined, the Supreme Court has consistently held that government may not interfere with the dialogue a woman has in consultation with her physician about the option of abortion during the early stages of pregnancy. *Thornburgh v. American College of Obst. & Gyn.*, 476 U.S. 747, 759, 106 S.Ct. 2169, 2178, 90 L.Ed.2d 779 (1986); *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 429–30, 103 S.Ct. 2481, 2492–93, 76 L.Ed.2d 687 (1983); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 66, 96 S.Ct. 2831, 2839, 49 L.Ed.2d 788 (1975). Dictating the kind of information to be provided interferes both with a woman's right to make an informed choice about the option of abortion and with the physician's obligation to give information appropriate under the circumstances of her particular case. *Akron*, 462 U.S. at 443–45, 103 S.Ct. at 2499–50. As the Court noted in *Thornburgh*, there are two reasons for invalidating informational requirements. The first arises when the required information "is designed not to inform the woman's consent, but to persuade her to withhold it altogether." *Thornburgh*, 476 U.S. at 762, 106 S.Ct. at 2179 (quoting *Akron*, 462 U.S. at 444, 103 S.Ct. at 2500). The second arises when "a rigid requirement that a specific body of information be given in all cases, irrespective of the particular needs of the patient, intrudes upon the discretion of the pregnant woman's physician and thereby imposes the 'undesired and uncomfortable straight-jacket' with which the Court" expressed concern in *Danforth*. *Id.* (quoting *Danforth*, 428 U.S. 52, 67 n. 8, 96 S.Ct. 2831, 2840, 49 L.Ed.2d 788 (1976)).

One of the items of information required for an informed consent in *Thornburgh* was a list of agencies offering alternatives to abortion. *Id.* at 747, 106 S.Ct. at 2169. In invalidating the requirement, the Court said:

> Even the listing of agencies in the printed ... *form presents serious problems;* it contains names of agencies that well may be out of step with the needs of the particular woman and thus places the physician in an awkward position and infringes upon his or her professional responsibilities. Forcing the physician or counselor to present the materials and the list to the woman makes him or her in effect an agent of the State in treating the woman and places his or her imprimatur upon both the materials and the list.... All this is, or comes close to being, state medicine imposed upon the woman, not the professional medical guidance she seeks, and it officially structures—as it obviously was intended to do—the dialogue between the woman and her physician.

*Id.* at 762–63, 106 S.Ct. at 2179–80 (citation omitted). As the Court had concluded in *Akron*, requiring the provision of "dubious" facts and an "inflexible list of information" unreasonably places "obstacles in the path of the doctor upon whom [the woman] is entitled to rely for advice in connection with her decision." *Akron*, 462 U.S. at 445, 103 S.Ct. at 2500 (quoting *Whalen v. Roe*, 429 U.S. 589, 604 n. 33, 97 S.Ct. 869, 879 n. 33, 51 L.Ed.2d 64 (1977)). The government's discretion to regulate abortions does not permit it to adopt regu-

lations that depart from accepted medical practice. *Id.* 462 U.S. at 431, 103 S.Ct. at 2493.

The informational requirements in *Thornburgh* and *Akron* were applicable to all physicians and their pregnant clients while the informational requirements of section 59.8(a)(2) apply only to those who are operating with Title X funds. As previously discussed, *supra,* the funding cases of *Harris* and *Maher* make clear that the government may favor childbirth over abortion through the allocation of funds and that, not having created the obstacle of indigency that results from the failure to fund, there is no direct state interference with the woman's access to an abortion. Applying the rationale of *Harris* and *Maher,* the court is unable to conclude that the obstacle created by subsection (a)(2) is indigency and, therefore, not of the government's making.

 Unlike subsection (a)(1), subsection (a)(2) is not merely a funding directive that leaves the pregnant Title X client in the same position in which she would have been had the government decided not to become involved in offering family planning services. The informational requirement of subsection (a)(2) is directed at the conduct of Title X employees. In order to remain eligible for Title X funds, physicians or employees must provide pregnant Title X clients with a list of providers who promote the welfare of the unborn child. Since providers who perform abortions do not promote the welfare of the unborn child, they must be excluded from the list. The effect of the requirement is that the Title X client who is pregnant cannot be given information about providers offering the option of abortion regardless of what she and her physician decide is best under her particular circumstances. The obstacle in the woman's path is not indigency, as in the other funding cases; rather, the obstacle is lack of access to information she is otherwise entitled to receive from her physician. The informational requirement does more than implement a policy decision to favor childbirth over abortion. It constitutes direct state interference with the pro-tected dialogue between a woman and her physician, and, accordingly, unreasonably interferes with the woman's right to seek an abortion.

 The second sentence of subsection 59.8(a)(2) prescribes that the pregnant client must be provided with information necessary to protect the health of the mother and the unborn child until such time as the referral appointment to another provider is kept. The thrust of the first sentence of subsection (a)(2) is continued into the requirement of the second sentence in that the referral appointment to which reference is there made relates back to an appointment with providers who do not provide abortions. Were it not for the reference back, the requirement of the second sentence would be rationally related to the government's legitimate interest in the health and well-being of both the mother and her unborn child until the woman implements her final decision of abortion or childbirth. However, the delay imposed by requiring referral to providers who do not perform abortions may, *inter alia,* impermissibly moot the abortion option by carrying the client into the second trimester. Consequently, the first and second sentences of (a)(2) cannot survive.

The final sentence of subsection 59.-8(a)(2) provides that when a pregnant Title X client requires emergency care, the Title X project need only "refer the client immediately to an appropriate provider of emergency medical services." The final sentence makes clear that notwithstanding the general abortion counseling and referral prohibition of subsection 59.8(a)(1), a Title X project is obligated to make immediate referrals for appropriate medical care "when confronted with a life-threatening medical condition," such as an ectopic pregnancy. 53 Fed.Reg. 2922, 2937 (Comments, Final Rules, Feb. 2, 1988); *see* 42 C.F.R. § 59.8(b)(2). The provision for immediate referral distinguishes this sentence from the second sentence in that it does not impose a delay that might interfere with the option of abortion. Nor does the final sentence interfere with the woman's right to information about the abortion option.

While the Title X project itself would not be providing abortion information, there is no impermissible restriction on the nature of the information provided, and complete information can be timely furnished by the emergency medical care provider. Inasmuch as this referral provisions does not create an obstacle that would not otherwise be present, the final sentence of subsection 59.8(a)(2) is not an impermissible interference with a woman's right to an abortion.

■ Subsection 59.8(a)(3) directs a Title X project not to use "prenatal, social service or emergency medical or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning" and provides examples of inclusions and exclusions on the referral list that would be deemed to be impermissible. The effect of (a)(3) is the same as that of the first two sentences of (a)(2): to control the flow of information to a pregnant client for whom abortion may be the best option. Inasmuch as (a)(3) seeks to censor the referral list, it, like the first two sentences of (a)(2), creates an obstacle which unreasonably interferes with the woman's right to information she is entitled to receive in her decision-making process.

■ Subsection 59.8(a)(4) provides that a Title X project may furnish information which is "medically necessary to assess the risks and benefits of different methods of contraception" to clients who are in the process of selecting a contraceptive method "*provided*, that the provision of this information does not include counseling with respect to or otherwise promote abortion as a method of family planning." Subsection (a)(4) enables Title X projects to provide clients with a manufacturer's information about contraceptive methods even though that information makes reference to abortion as an alternate method of family planning. 53 Fed.Reg. 2922, 2931–33. (Comments, Final Rules, Feb. 2, 1988); *see* 42 C.F.R. § 59.8(b)(6). Inasmuch as subsection (a)(4) is consistent with the government's intent to subsidize only preventive family planning services and does not restrict the flow of information between a pregnant woman and her physician, it is not an impermissible interference with a woman's right to seek an abortion.

Looking at the whole of section 59.8(a), the court finds that the refusal to subsidize abortion counseling and referral, found in subsection (a)(1), does not constitute an unduly burdensome interference with a woman's right to seek an abortion. The mere refusal to fund abortion counseling and referral imposes no restrictions on access to abortions that were not already there. Neither do subsection (a)(4) and the last sentence of subsection (a)(2) impermissibly interfere with a woman's right to seek an abortion inasmuch as they impose no undue restrictions on the information a Title X project may provide its clients. However, the directives of the first two sentences of subsections (a)(2) and all of (a)(3) are an impermissible interference with a woman's right to seek an abortion because the obstacle created—interference with the dialogue between a pregnant woman and her physician about the option of abortion—is of the agency's making and is more than a simple refusal to fund activity that is not consonant with the government's favored policy.

Moreover, the detailed provisions of the informational requirements of (a)(2) and (a)(3) contradict the agency's contention that Title X projects under the new regulations are limited to preconception services. Indeed, those requirements are directly contrary to the definition contained in section 59.2 that "[f]amily planning does not include pregnancy care (including obstetric or prenatal care)." If the services of a Title X project are not offered after conception occurs, there is no necessity to provide detailed instructions about the information to be furnished once pregnancy is diagnosed. To the extent that the agency chooses to fund Title X family planning projects that offer postconception services, it cannot then limit the information given to a pregnant woman without creating an unduly burdensome interference with the right to reproductive choice guaranteed under *Roe v. Wade.*

Yet, by organizing Title X family planning projects in a manner that insures that

postconception services are not provided, the constitutionally impermissible restrictions on information that may be given to pregnant women is thereby avoided. If the impermissible restrictions of subsections (a)(2) and (a)(3) are deleted, the agency will be able to fulfill its goal of providing preconception services without impermissibly interfering with the protected dialogue between a pregnant woman and her physician. Similarly, subsection (a)(4) furthers the goal of providing a broad range of family planning services by making it clear that a Title X project does not violate subsection (a)(1)'s general prohibition against abortion counseling by providing a client full information about contraceptive methods even though some of the information provided contains references to abortion as a method of family planning.

The impermissible restrictions on information contained within subsections (a)(2) and (a)(3) can be severed without impairing the function of section 59.8 as a whole. Striking the impermissible portions, being the first two sentences of (a)(2) and the whole of (a)(3), does not prevent HHS from offering preconception services. Inasmuch as the stated intent of HHS was to provide a broad range of preventive family planning services, there is no substantial doubt that the agency would have adopted the surviving portions of sections 59.8 without those found to be impermissible.

B. *Section 59.9: Maintenance of Program Integrity*

Section 59.9 [19] provides that Title X projects must be organized so that they are physically and financially separate from the abortion-related activities that are prohibited by section 1008. In order to satisfy the requirement of physical and financial separation, "a Title X project must have an objective integrity and independence from prohibited activities." § 59.9. The integrity and independence of Title X projects are to be determined by the facts and circumstances on a case-by-case basis. *Id.;* 53 Fed.Reg. 2922, 2940 (Feb. 2, 1988). One of the factors relevant to the Secretary's de-

termination of the program's integrity is the existence of separate personnel. § 59.9(c). The Secretary has stated that a Title X project sharing personnel with projects providing abortion-related activities will be in compliance with section 59.9 if it "can demonstrate on an overall basis that it is objectively separated" from those activities. 53 Fed.Reg. at 2941.

■ To the extent that the Secretary might base a determination of a project's eligibility for Title X funds upon the existence of personnel who do not engage in prohibited activities, the concern is raised that otherwise eligible projects will be denied funding if they employ personnel who engage in abortion-related activities outside their employment by the Title X project. *See New York v. Sullivan,* 889 F.2d 401, 414 (2d Cir.1989) (Cardamone, J., concurring); 53 Fed.Reg. at 2939. Should the Secretary withhold funding on the basis of personnel's exercise of their First Amendment rights outside the scope of their Title X employment, it would constitute an impermissible penalty on protected expression under *Perry v. Sinderman,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). *See infra* p. 951; *see also Sullivan,* 889 F.2d at 414 (Cardamone, J., concurring).

Inasmuch as the regulations state that the existence of separate personnel is but one factor to be considered in determining a project's compliance with section 59.9 and for the further reason that there is no indication in the record that the Secretary intends to rely upon the activities of personnel outside the scope of their Title X employment in determining Title X eligibility, the court agrees with Judge Cardamone's concurring opinion in *New York v. Sullivan,* 889 F.2d at 414, that section 59.9 is constitutionally sound. If the Secretary's future conduct should show an impermissible consideration of the protected activities of personnel outside the scope of their Title X employment, that conduct may form the basis for another action for relief.

---

**19.** The relevant portions of section 59.9 are set out in full in Appendix A.

## C. *Section 59.10. Prohibition on Activities*

Section 59.10 [20] prohibits Title X projects from engaging in activities that "encourage, promote or advocate abortion as a method of family planning." In addition to the general prohibition, there are specific prohibitions against lobbying, payment of speaker's fees, payment of dues, use of legal action, and development and dissemination of materials. § 59.10(a). Projects engaging in any of the prohibited activities lose their eligibility for Title X funds. § 59.7.

Section 59.10 must be read in conjunction with the new definitions in section 59.2. The last sentence of the definition of "Title X program" and "Title X project" states that "Title X project funds include all funds allocated to the Title X program, including but not limited to grant funds, grant-related income or matching funds." § 59.2. The agency's intent in including this sentence was to make it clear that the prohibition of section 1008 "extends to all actions conducted by the federally funded project, not just the use of federal funds for abortions within the project." 53 Fed. Reg. 2922, 2922 (Feb. 2, 1988). The prohibitions are not intended to apply to all the activities of a funded organization but only to those projects which are operated with Title X funds.[21]

■ Inasmuch as "grant-related income" and "matching funds" include income Title X projects receive from other sources, the effect of the new definition is to restrict the use of those funds in the same manner that Title X funds are restricted. As a general rule, Title X projects receive ninety percent of their funding from Title X. *See* 42 U.S.C. § 300a–4 (1982). In many if not most instances, an organization's income from other governmental programs, insurance and patient fees are used to provide the required ten percent matching contribution. Plaintiffs' Memorandum at 6. However, in West Virginia, the remaining project funding is derived from a ten percent matching contribution provided by the state. If plaintiffs' own funds were being used to satisfy the required matching contribution, the question would then exist as to the extent to which it would be constitutionally permissible for restrictions to be imposed on those funds. However, that is not in issue here inasmuch as the state provides the entirety of the matching contribution and it is well established that federal restrictions on speech activities may be made applicable to state funds in voluntary matching programs. *See, e.g., Oklahoma v. Civil Serv. Comm'n*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947).

In addition to providing the matching contribution, the State Health Department pays the organization for services rendered, using federal and state Medicaid funds and other federal grant funds for eligible clients, and the organization may also receive program-related income from patient fees, private insurance and other sources, all of which may be used to expand family planning services. Plaintiffs' Memorandum at 5–7, 7 n. 9, 17. Under the regulations which establish uniform requirements for the administration of all HHS grants, "grant-related income" includes "program income." *See* 45 C.F.R. §§ 74.1 and 74.40. In turn, "program income" includes:

> [G]ross income earned by a recipient from activities part or all of the costs of which is either borne as a direct cost by a grant or counted as a direct cost towards meeting a cost sharing or matching requirement of a grant. It includes but is not limited to such income in the form of fees for services performed during the grant or subgrant period.

§ 74.41(a). Accordingly, under the broad definition of "program income," an organization's project-generated income is grant-related income and subject to the restrictions imposed by the new regulations.

---

**20.** The relevant portions of section 59.10 are set out in full *supra* pp. 934–935, and in Appendix A.

**21.** See *supra* note 6, for the definition of "project."

Plaintiffs contend that the new definition of Title X project funds taken together with section 59.10 constitutes an impermissible constitutional penalty in that they would be prohibited from using project-generated income for protected speech activities.[22] Defendant maintains that there is no constitutional penalty because the regulations restrict only public funds and government is not required to subsidize protected speech. Given the broad definition of grant-related income, the agency's contention that the new regulations restrict only public funds is not supported by the clear language of the applicable regulations. However, restrictions that may be imposed with respect to the use of federal funds generated by a Title X project do not appear to be constitutionally permissible with respect to non-federal funds generated by that same project in the form of payments by state and private sources for services and the like, as well as private donations from the organization's own funds or otherwise.[23] The court, accordingly, distinguishes between project-generated income received from federal sources and project-generated income received from other sources, which can be characterized as the organization's private funds. Plaintiffs also contend that the prohibitions are impermissible restrictions on content-based speech because they prohibit only pro-abortion activities. Defendant maintains that the prohibitions are content-neutral in that they prohibit the funding of speech activities on the entire subject of abortion regardless of the viewpoint being expressed.

Although the plain language of section 59.10 contradicts defendant's content-neutral claim, even if that assertion were correct the agency would not be allowed to foreclose an organization's speech activities on a particular abortion viewpoint. As the Supreme Court has stated:

> The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to the prohibition of public discussion on an entire topic. As a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." ... If the marketplace of ideas is to remain free and open, government must not be allowed to choose "which issues are worth discussing or debating."

*Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980) (quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972)). Notwithstanding government's inability to prohibit protected speech on the basis of the view expressed, that question is not before the court. Rather, the questions raised by the new regulations are whether they impose an impermissible constitutional penalty on plaintiffs' use of project-generated income for protected speech activities, and whether HHS can refuse to fund protected speech activities.

The question of constitutional penalty arises when government seeks to make the receipt of a benefit contingent upon an independently unconstitutional condition. The Supreme Court has stated that a governmental regulation acts as a penalty against constitutionally protected activities when the regulation seeks to "produce a result which [it] could not command directly." *Speiser v. Randall,* 357 U.S. 513, 528, 78 S.Ct. 1332, 1343, 2 L.Ed.2d 1460 (1958). More specifically, when the regulation indirectly seeks to infringe on constitutionally protected speech by the denial of a governmental benefit, the Court has stated:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that in-

---

**22.** The agency does not contend that the activities restricted under section 59.10 are unprotected under the First Amendment.

**23.** *See infra* pp. 951–954.

fringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly," *Speiser v. Randall*, 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460]. Such interference with constitutional rights is impermissible.

*Perry v. Sinderman*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

 Section 59.10 restricts protected First Amendment rights by prohibiting speech-related activities which promote or encourage abortion. While it may be permissible to prohibit the use of federal funds for protected activities, *Regan v. Taxation With Representation*, 461 U.S. 540, 544–45, 103 S.Ct. 1997, 2000–01, 76 L.Ed.2d 129 (1983) (lobbying), it is an impermissible penalty on protected expression when the availability of federal funding is made dependent upon restricting activities paid for by private funds. *FCC v. League of Women Voters*, 468 U.S. 364, 399–401, 104 S.Ct. 3106, 3127–28, 82 L.Ed.2d 278 (1984). Allowing the government to make the receipt of public funds contingent upon the sacrifice of First Amendment rights would permit the government to indirectly control the use of private funds for constitutionally protected activity—something it cannot do directly.

Courts considering the penalty question in abortion-related cases have consistently held that it is impermissible to make federal grants and subsidies conditional upon an organization's termination of constitutionally protected activities which are funded through private sources. *Planned Parenthood v. Arizona*, 789 F.2d 1348 (9th Cir.), *aff'd mem. sub nom., Babbitt v. Planned Parenthood*, 479 U.S. 925, 107 S.Ct. 391, 93 L.Ed.2d 346 (1986); *Planned Parenthood Ass'n v. Kempiners*, 531 F.Supp. 320 (N.D. Ill.1981), *vacated and remanded on other grounds*, 700 F.2d 1115 (7th Cir.1983), *aff'd*

*on rehearing*, 568 F.Supp. 1490 (N.D.Ill. 1983); *Valley Family Planning v. North Dakota*, 489 F.Supp. 238, 242–43 (D.N.D. 1980), *aff'd on other grounds*, 661 F.2d 99 (8th Cir.1981); *see Harris v. McRae*, 448 U.S. 297, 317 n. 19, 100 S.Ct. 2671, 2688 n. 19, 65 L.Ed.2d 784 (1980) (suggesting that withholding all medicaid benefits from a woman who terminated her pregnancy would be an impermissible penalty on her constitutional right to an abortion). The right of government to proscribe the use of public funds for disfavored activities does not include the right to proscribe the use of private funds for the same constitutionally protected activities. *DKT Memorial Fund, Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 304–06 (D.C.Cir.1989) (Ginsburg, J., dissenting in part) (citing *Massachusetts v. Bowen*, 679 F.Supp. 137 (D.Mass.1988), *aff'd sub nom., Massachusetts v. Sullivan*, 873 F.2d 1528 (1st Cir.) (advance sheets), *reh'g granted, opinion vacated and withdrawn*, 873 F.2d 1528 (1st Cir.1989) (Tourruella, J., dissenting in part)).

 As the new definition of "Title X program" and "Title X project" stands, it subjects all of the funds received by a Title X grantee organization to the same prohibitions that apply to Title X federal funds. The result is to condition the receipt of federal funds upon the termination of protected First Amendment activities funded through private sources. Requiring family planning organizations to sacrifice their protected speech-related activities as a condition to the receipt of Title X funds is an impermissible constitutional penalty. Accordingly, the court finds that the second sentence of the definition is impermissible to the extent that "Title X project funds" includes non-federal project-generated income.

Having concluded that HHS may not prohibit an organization's use of its non-federal project-generated income for the activities specified in section 59.10, the question remains whether the agency can prohibit the use of Title X funds for those purposes. The Supreme Court has repeatedly distinguished between the denial of a benefit and the obligation of government to subsidize

constitutionally protected activities by the granting of a benefit. *E.g., Lyng v. International Union, UAW*, 485 U.S. 360, 108 S.Ct. 1184, 1189–91, 99 L.Ed.2d 380 (1988) (denial of food stamp benefits to households including a striking worker is not impermissible infringement on the First Amendment right of association because "the striker's right of association does not require the Government to furnish funds to maximize the exercise of that right"); *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983) ("This Court has never held that Congress must grant a benefit ... to a person who wishes to exercise a constitutional right."); *Harris v. McRae*, 448 U.S. 297, 317 n. 19, 100 S.Ct. 2671, 2688 n. 19, 65 L.Ed.2d 784 (1980) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."); *Cammarano v. United States*, 358 U.S. 498, 515, 79 S.Ct. 524, 534, 3 L.Ed.2d 462 (1959) (Douglas, J., concurring) (rejecting the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State").

In *Regan*, the Court held that "Congress is not required by the First Amendment to subsidize lobbying." 461 U.S. at 546, 103 S.Ct. at 2001. At issue in *Regan* were Internal Revenue Code provisions that denied eligibility to otherwise qualified tax-exempt organizations for tax-deductible contributions for all activities if they engaged in "substantial lobbying" activities. Similar organizations which did not engage in lobbying were entitled to tax-deductible contributions. In upholding the regulation, the Court found that "Congress has not infringed any First Amendment rights or regulated any First Amendment activity. Congress has simply chosen not to pay for ... lobbying." *Id.* The Court's rationale was the same as in the public funding of abortion cases: "[A]lthough government may not place obstacles in the path of a [person's] exercise of ... freedom of [speech], it need not remove those not of its own creation." *Id.* at 549–50, 103 S.Ct. at 2003 (quoting *Harris v. McRae*, 448 U.S.

297, 316, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980)).

In dicta, however, the Court qualified its holding by stating that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'ai[m]' at the suppression of dangerous ideas.'" *Id.* 461 U.S. at 548, 103 S.Ct. at 2002 (citing *Cammarano*, 358 U.S. at 513, 79 S.Ct. at 533, quoting *Speiser v. Randall*, 357 U.S. 513, 519, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958)). In his concurring opinion, Justice Blackmun said that "a statute designed to discourage the expression of particular views would present a very different question." *Id.* 461 U.S. at 551, 103 S.Ct. at 2004 (Blackmun, J., concurring). Furthermore, it was significant to Justice Blackmun that the Code did not deprive organizations of all lobbying rights. By establishing an affiliate with a separate identity and by keeping records sufficient to show that lobbying was not paid for by tax-deductible contributions, the "organization's right to speak [was] not infringed, because it [was] free to make known its views on legislation through its ... affiliate without losing tax benefits for its nonlobbying activities." *Id.* at 552–53, 103 S.Ct. at 2005. Of particular concern to Justice Blackmun was the restricted organizations' ability to "make known their views on legislation without incurring the unconstitutional penalty." *Id.* at 553, 103 S.Ct. at 2005. In his view, a total restriction on lobbying would extend far beyond the mere refusal to subsidize. *Id.*

In *FCC v. League of Women Voters of California*, 468 U.S. 364, 104 S.Ct. 3106, 3109, 82 L.Ed.2d 278 (1984), the Court was presented with a statute that prevented public television stations from receiving federal funds if they engaged in editorializing. As an initial matter, the Court found that the restriction was content-based because only speech of an editorial nature was prohibited. *Id.* at 383, 104 S.Ct. at 3119. In finding that the refusal to fund editorializing was impermissible, the Court distinguished *Regan* on the basis that the organizations in *Regan* remained free to receive tax deductible contributions for non-lobbying activities by establishing a

separate affiliate to pursue its lobbying activities with nondeductible contributions. *Id.* 468 U.S. at 399–400, 104 S.Ct. at 3127–28. By contrast, in *League of Women Voters*, stations receiving grants were barred from all editorializing, even that financed by private funds, because there was no way to segregate the federal funds and limit their use to noneditorializing activities. In conclusion, the Court stated:

> Of course, if Congress were to adopt a revised version of § 399 that permitted noncommercial educational broadcasting stations to establish "affiliate" organizations which could then use the station's facilities to editorialize with nonfederal funds, such a statutory mechanism would plainly be valid under the reasoning of *Taxation With Representation.* Under such a statute, public broadcasting stations would be free, in the same way that the charitable organization in *Taxation With Representation* was free, to make known its views on matters of public importance through its nonfederally funded, editorializing affiliate without losing federal grants for its noneditorializing broadcast activities.

*Id.* at 400, 104 S.Ct. at 3128.

When comparing the permissible refusal to fund in *Regan* to the impermissible refusal in *League of Women Voters*, the critical distinction is whether the restricted organization remains free to exercise its First Amendment rights with nonfederal funds without losing its funding for other activities.

In its commentary to the final rules, HHS stated its position that the prohibitions of section 59.10 "do not prohibit organizations from establishing affiliates that provide abortion materials. They permit an organization to operate both a Title X project and a project that would educate women on abortion so long as they are separate and distinct." 53 Fed.Reg. 2921, 2943 (Feb. 2, 1988). With respect to the provisions respecting dues payment, lobbying and litigation, the agency stated that the prohibitions do not affect all of the activities of a grantee organization, but only the use of Title X funds for the prohibited activities. *Id.*

While the commentary statements do not comport with the broad definition of Title X project funds, the court's determination that grant-related income may not be defined so as to include non-federal project-generated income insures that the Title X grantee will be entitled to exercise its protected speech-related activities with the project-generated income from non-federal sources. By excluding non-federal project-generated income from the scope of the restrictions imposed by the new regulations, the court is satisfied that section 59.10 is not an impermissible penalty on protected activity, but comes within the ambit of *Regan* and is simply a refusal to subsidize. Organizations conducting Title X projects do not lose funding for those projects if they finance their protected activity with non-federal funds and keep accounting records sufficient to show that Title X funds are not being used for those purposes.

## IV. CONCLUSION

For the reasons stated above, it is ORDERED that plaintiffs' complaint and motion for final declaratory and injunctive relief on the merits be, and the same hereby is, granted in part and denied in part. It is declared that the definition of "Title X program" and "Title X project," found at 42 C.F.R. § 59.2, is invalid insofar as project-generated income from non-federal sources is included within the grant-related component of Title X project funds. It is further declared that the first two sentences of 42 C.F.R. § 59.8(a)(2) and the whole of 42 C.F.R. § 59.8(a)(3) are constitutionally impermissible. The defendant is, accordingly, enjoined from implementing the regulations promulgated under Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–6 (1982), and found at 42 C.F.R. §§ 59.1–59.17 (1988), against the plaintiffs and the entities they represent insofar as portions of sections 59.2 and 59.8 have been determined herein to be impermissible.

In order to allow all parties to make the adjustments necessitated by the implementation of the new regulations and the provisions of this decree, it is further ORDERED that the new regulations will not take effect in the State of West Virginia until May 1, 1990.

## APPENDIX A

The relevant provisions of the new regulations, found at 42 C.F.R. §§ 59.1 *et seq.* (1988), provide as follows:

§ 59.2 Definitions.

As used in this subpart:

. . . .

"*Family planning*" means the process of establishing objectives for the number and spacing of one's children and selecting the means by which those objectives may be achieved. These means include a broad range of acceptable and effective methods and services to limit or enhance fertility, including contraceptive methods (including natural family planning and abstinence) and the management of infertility (including adoption). Family planning services includes preconceptional counseling, education, and general reproductive health care (including diagnosis and treatment of infections which threaten reproductive capability). Family planning does not include pregnancy care (including obstetric or prenatal care). As required by section 1008 of the Act, abortion may not be included as a method of family planning in the Title X project. Family planning, as supported under this subpart, should reduce the incidence of abortion.

. . . .

"*Program*" and "*project*" are used interchangeably and mean a coherent assembly of plans, activities and supporting resources contained within an administrative framework.

. . . .

"*Title X program*" and "*Title X project*" are used interchangeably and mean the identified program which is approved by the Secretary for support under section 1001 of the Act, as the context may require. Title X project funds include all funds allocated to the Title X program, including but not limited to grant funds, grant-related income or matching funds.

§ 59.7 Standards of compliance with prohibition on abortion.

A project may not receive funds under this subpart unless it provides assurance satisfactory to the Secretary that it does not include abortion as a method of family planning. Such assurance must include, as a minimum, representations (supported by such documentation as the Secretary may request) as to compliance with each of the requirements in § 59.8 through § 59.10. A project must comply with such requirements at all times during the period for which support under Title X is provided.

§ 59.8 Prohibition on counseling and referral for abortion services; limitation of program services to family planning.

(a)(1) A Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning.

(2) Because Title X funds are intended only for family planning, once a client served by a Title X project is diagnosed as pregnant, she must be referred for appropriate prenatal and/or social services by furnishing a list of available providers that promote the welfare of mother and unborn child. She must also be provided with information necessary to protect the health of mother and unborn child until such time as the referral appointment is kept. In cases in which emergency care is required, however, the Title X project shall be required only to refer the client immediately to an appropriate provider of emergency medical services.

(3) A Title X project may not use prenatal, social service or emergency medical or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning, such as by weighing the list of referrals in favor of health care providers which

perform abortions, by including on the list of referral providers health care providers whose principal business is the provision of abortion, by excluding available providers who do not provide abortions, or by "steering" clients to providers who offer abortion as a method of family planning.

(4) Nothing in this subpart shall be construed as prohibiting the provision of information to a project client which is medically necessary to assess the risks and benefits of different methods of contraception in the course of selecting a method; *provided,* that the provision of this information does not include counseling with respect to or otherwise promote abortion as a method of family planning.

§ 59.9 Maintenance of program integrity.

A Title X project must be organized so that it is physically and financially separate, as determined in accordance with the review established in this section, from activities which are prohibited under section 1008 of the Act and § 59.8 and § 59.10 of these regulations from inclusion in the Title X program. In order to be physically and financially separate, a Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient. The Secretary will determine whether such objective integrity and independence exist based on a review of facts and circumstances. Factors relevant to this determination shall include (but are not limited to):

(a) The existence of separate accounting records;

(b) The degree of separation from facilities (*e.g.,* treatment, consultation, examination, and waiting rooms) in which prohibited activities occur and the extent of such prohibited activities;

(c) The existence of separate personnel;

(d) The extent to which signs and other forms of identification of the Title X project are present and signs and material promoting abortion are absent.

§ 59.10 Prohibition on activities that encourage, promote or advocate abortion.

(a) A Title X project may not encourage, promote or advocate abortion as a method of family planning. This requirement prohibits actions to assist women to obtain abortions or increase the availability or accessibility of abortion for family planning purposes. Prohibited actions include the use of Title X project funds for the following:

(1) Lobbying for the passage of legislation to increase in any way the availability of abortion as a method of family planning;

(2) Providing speakers to promote the use of abortion as a method of family planning;

(3) Paying dues to any group that as a significant part of its activities advocates abortion as a method of family planning;

(4) Using legal action to make abortion available in any way as a method of family planning; and

(5) Developing or disseminating in any way materials (including printed matter and audiovisual materials) advocating abortion as a method of family planning.

## JUDGMENT ORDER

Pursuant to the Memorandum Order this day entered herein, it is ORDERED, ADJUDGED and DECREED that:

1. The definition of "Title X program" and "Title X project," found in Section 59.2 of Title 42 of the Code of Federal Regulations, promulgated under Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–6 (1982), be, and the same hereby is, declared constitutionally impermissible insofar as project-generated income from non-federal sources is included within the grant-related component of Title X project funds.[1]

---

1. Inasmuch as the matching funds component of Title X project funds is supplied by state funding in West Virginia, that aspect of the definition of Title X program and Title X project need not be addressed, as more fully noted in the memorandum order, *supra,* at 950.

2. The first two sentences of Subsection 59.8(a)(2) and the whole of Subsection 59.-8(a)(3) of Title 42 of the Code of Federal Regulations, promulgated under Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–6 (1982), be, and the same hereby are, declared constitutionally impermissible.

3. The defendant, in his capacity as Secretary of the Department of Health and Human Services, and all other officers, agents, employees and attorneys of said Department, be, and the same hereby are, permanently enjoined from implementing or enforcing the regulations found at Sections 59.1 through 59.17 of Title 42 of the Code of Federal Regulations, promulgated under Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–6 (1982), insofar as the regulations would prohibit or restrict plaintiffs and the entities they represent in the use of non-federal project-generated income.

4. The defendant, in his capacity as Secretary of the Department of Health and Human Services, and all other officers, agents, employees and attorneys of said Department, be, and the same hereby are, permanently enjoined from implementing or enforcing the first two sentences of Subsection 59.8(a)(2) and the whole of Subsection 59.8(a)(3) of Title 42 of the Code of Federal Regulations, promulgated under Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–6 (1982), against the plaintiffs and the entities they represent.

5. The effective date for implementation and enforcement of the regulations found at Title 42, Sections 59.1 through 59.17 of the Code of Federal Regulations, in the State of West Virginia, except insofar as their implementation has been enjoined herein, shall be May 1, 1990.

All matters in this case having been concluded, it is further ORDERED that this civil action be, and the same hereby is, dismissed and stricken from the docket of the court.